394 A.2d 1276

Robert G. WITMER, Appellant,

Walter B. Slingerland, Appellant,

Larry Miller, Appellant,

Alexander Lauer, Appellant,

John W. Rintz, Appellant,

Francis J. Fritz, Appellant,

John J. Kunkel, Appellant,

v.

EXXON CORPORATION, Appellee.

Superior Court of Pennsylvania.

Argued Sept. 13, 1978.

Decided Nov. 22, 1978.

540.

Martin J. Resnick, Philadelphia, with him Norman P. Zarwin, Philadelphia, for appellants.

Kell M. Damsgaard, Philadelphia, for appellee.

Before PRICE, HESTER and HOFFMAN, JJ.

HOFFMAN, Judge:

These are seven similar cases brought by various service station franchisees against their common franchisor, Exxon Corporation (Exxon) to enjoin Exxon from collecting increases in service station rentals, to compel Exxon to return all collected rent increases, and to negotiate in good faith

with the franchisees (appellants) to set mutually agreeable rentals. In each case, the lower court sustained Exxon's demurrer, and dismissed appellant's complaints. It is from these orders that appellants now appeal. We affirm.

The facts of each of the seven cases, here consolidated on appeal, are substantially similar, but are set forth here separately for the sake of clarity. Because the cases come to us upon a dismissal of the actions, all well-pleaded facts revealed in the complaints and exhibits properly attached thereto must be taken as true.

Appellant Robert G. Witmer is the lessee of an Exxon service station at Route 222 & Tuckerton Road in Temple, under a one-year lease which expired on March 5, 1977. The lease had set the rental payments for the station at 1.65 cents per gallon of gasoline sold, and was frozen by the federal government under the authority of the Economic Stabilization Act of 1970. This lease contains a "rental reopener" clause [1] which provides that Exxon may, once

1. The rental reopener clause reads in full:

"(2–A) *Rental Reopener Clause*: Exxon may give written notice of an intent to adjust or change the rental (and/or method of calculating the rental) Lessee is to pay for this lease specifying the effective date (which shall not be less than sixty days after the date of said notice) and the amount and other details of said adjustment. If the proposed adjustment or change is not satisfactory to Lessee, and Exxon and Lessee fail to reach agreement in that regard within thirty days after the date of said notice, then Lessee may terminate this lease upon written notice to Exxon as provided in Article (1) above or upon such shorter time period as may be elected by Lessee. If within 60 days following the date of Exxon's notice Lessee has not elected to terminate this lease, then the rental adjustment or change proposed by Exxon shall become effective on the date specified in such notice.

"Exxon's right to adjust or change the rent shall be limited as follows:

"1. Exxon may not give notice of an adjustment or change until at least 90 days of the lease term shall have expired.

"2. Exxon can give notice of a rent adjustment or change as provided in this Article (2) only once during the term of this lease specified above except that this provision shall not abridge or alter the rent adjustment procedures under Article (7) hereof in any way.

"3. If Exxon should adjust or change the rent in a manner which results in a rent increase to Lessee, Lessee shall be under no obligation to pay Exxon a rental which exceeds by more than 1¢ per gallon the amount of rental which would be due under Clause two of the

during the term of the lease, and upon sixty days notice, increase the station rental, but not by more than one cent per gallon. If the lessee objects to a proposed rent increase, then he may terminate his obligations under the lease without liability.

On July 29, 1976, about seven months after rent controls on the service stations were abolished, Exxon wrote to Witmer, giving notice of its intent to increase his rent under the rental reopener clause, in stages to 3.83 and 4.03 cents per gallon.[2] In its letter, Exxon characterized these increases as the reestablishment of fair market rentals, now that rents were no longer controlled. Exxon later submitted to Witmer a new lease for 1977–78, calling for a station rent increase to 4.3 cents per gallon during the term. Witmer refused to execute this lease, but did not vacate the premises. On April 14, 1977, Exxon wrote to Witmer stating that he would be treated as a holdover tenant for a new one-year term[3] under the provisions of the former lease. By letter on April 26, 1977, Exxon notified Witmer that his rental during the holdover term would be increased to the aforementioned 4.3 cents per gallon, pursuant to the "extensions and renewals" clause of the lease,[4] which gives Exxon the right to

lease at the time the written notice to reopen is sent in accordance with the above (except insofar as an additional rental may be imposed to reflect the cost of additional investment in the premises pursuant to Article (7) hereof)."

2. Exxon subsequently reimbursed appellant Witmer for the amount of rentals paid in excess of the one cent per gallon increase limitation.

3. When a lease for a term of years expires, and the lessee remains in possession, the landlord may at his option treat the lessee as a holdover tenant. *Pittsburgh v. Charles Zubik & Sons, Inc.*, 404 Pa. 219, 223, 171 A.2d 776 (1961). Since the prior term of the lease was one year, the new term also became one year, by operation of law. *Mack v. Fennel*, 195 Pa.Super. 501, 506, 171 A.2d 844 (1961). Furthermore, the law implies that the possession of the holdover is subject to the same terms, conditions, and covenants as the old lease. *Charles Zubik*, supra.

4. The "extensions and renewals" clause reads in full as follows:
"(3) *Extensions and Renewals*: In consideration of the granting of this lease, it is understood and agreed that there shall be no contrac-

increase the rental when the lease is extended or renewed by operation of law for any reason. If the lessee objects and the parties cannot reach a mutually agreeable rental, then the rent is determined by a predetermined formula set forth in the clause, the only variable being the market value of the lessor's property, as determined by an independent appraiser named by the lessee who is acceptable to Exxon. By this letter, Exxon also brought to Witmer's attention these appraisal rights. However, Witmer never invoked these rights, and Exxon began to collect rent of 4.3 cents per gallon of gasoline sold to Witmer.

Appellant Walter B. Slingerland is the lessee of an Exxon service station at 9451 Academy Road, Philadelphia. He was operating under a one-year lease ending March 1, 1977, with a rental of 1.75 cents per gallon. Also on July 29, 1976, Exxon notified Slingerland of staged rental increases of 2.21 and 2.41 cents per gallon under the rental reopener clause,

tural or other obligation on the part of either party to extend or renew this lease: however, if this lease agreement should be extended or renewed by effect or operation of any law for any reason, it is understood and agreed that: (a) upon Exxon's giving written notice to Lessee of Exxon's intention to exercise its right under this section to adjust rentals, Exxon and Lessee shall negotiate an adjustment of rental. If no rental adjustment agreement is reached by the parties within 15 days after said notice, Lessee shall be required at his expense to furnish to Exxon an appraisal of the premises by a professional real estate appraiser acceptable to Exxon establishing the then market value of the premises based upon the highest and best use for the fee interest in said property without regard to the interest owned by Exxon or of the existence of this lease. The monthly rental thereafter, until otherwise adjusted hereunder, shall be $1/12$ of the sum of the following: (i) 10% of the appraised value of the fee interest in said premises, (ii) the total property taxes paid on the premises by Exxon in the preceding lease year, and (iii) Exxon's actual cost of repairs and maintenance performed on the premises during the preceding lease year. Such rental to be payable monthly in advance not later than the 10th day of each month during any such renewal or extended term. The right to rental adjustment under this section shall be a reoccuring right, which may be exercised by Exxon at any time and from time to time after any extension of the term hereof by operation of law. (b) Exxon shall have the right and privilege, at its sole option to make additions, changes and amendments to the term of such renewal or extended lease and to the other covenants and provisions hereof or to substitute a new lease agreement all as Exxon may determine to be necessary or desirable."

again citing the abolition of rent controls as the reason for the increase. For the new 1977–78 term, Exxon submitted a lease with a rental of 2.91 cents per gallon. Slingerland did not execute this lease, and on March 3, 1977, Exxon wrote to him stating that because he remained in possession after the end of his term, he would be treated as a holdover tenant bound under the former lease for a new term of one year. Exxon notified Slingerland that it would collect a rental of 2.91 cents per gallon during the holdover term pursuant to the extensions and renewals clause. Again, Slingerland did not exercise his appraisal rights, and Exxon began to collect the increased rent.

Appellant Larry Miller is the lessee of an Exxon service station at 3919 North Front Street, Harrisburg. He was operating under a one-year lease ending May 18, 1977, at a rental of 1.8 cents per gallon. On June 29, 1976, "when the ink on the lease was hardly dry," Exxon gave notice that because rent controls had been ended, a rental increase under the rental reopener clause to 2.58 and 2.78 cents per gallon would become effective in September 1, and December 1, 1976, respectively.[5] Exxon submitted a new lease for the term 1977–78 with a rental of 3.28 cents per gallon. Miller declined to execute this lease and remained in possession; on May 20, 1977, Exxon informed him that he would be treated as a holdover tenant for one year under the terms of his prior lease. On May 31, 1977, Exxon gave notice that it would collect a rental of 3.28 cents per gallon during this term pursuant to the extensions and renewals clause of the lease. Miller did not exercise his appraisal rights under the lease, and Exxon began to collect the increased rent.

Appellant Francis J. Fritz is the lessee of an Exxon service station at 7720 York Road in Baltimore, Maryland. He operated the premises under a one-year lease ending May 31, 1977, at a rental of 1.85 cents per gallon. On September

**5.** This was in violation of the lessee's 90-day "safe" period under the rental reopener clause. However, Exxon subsequently reimbursed appellant Miller to correct for this error and pushed the date of the first stage of the increase to December 1, 1976, and the second stage of the increase to March 1, 1977.

30, 1976, Exxon gave notice under the rental reopener clause to increase the rent of the station to 2.08 and 2.28 cents per gallon. Exxon proposed a lease for the new 1977–78 term with a rental of 2.51 cents per gallon. When Fritz declined to execute this lease, he was informed by Exxon on June 6, 1977, that he would be treated as a holdover for one year under the terms of the old lease. One week later, Exxon notified Fritz that his rent for the holdover term would be increased to 2.51 cents per gallon under the extensions and renewals clause of the lease. Although this letter advised Fritz of his appraisal rights, he never exercised them, and Exxon began to collect this rent on its gasoline sales to Fritz.

Appellant Alexander Lauer is the lessee of an Exxon service station at Route 202 & Swamp Road in Doylestown. He operated the premises under a three-year lease ending May 16, 1977, at a rental of 1.78 cents per gallon. There is no rental reopener clause in Lauer's lease. In June and July, 1976, Exxon notified Lauer that with the ending of controls on service stations rentals, his rent would be increased in the future. True enough, a few weeks before the expiration of the existing lease, Exxon submitted a new lease for one year at a rental of 2.25 cents per gallon. As Lauer refused to execute the lease, Exxon notified him on May 24, 1977, that he would be treated as a holdover tenant for a one-year term under the terms of the prior lease. On June 3, 1977, Exxon gave Lauer notice that his rent for the holdover term would be increased to 2.25 cents per gallon, effective August 1, 1977, pursuant to the extensions and renewals clause in the lease, and advised him of his appraisal rights thereunder. However, Lauer did not exercise these rights and Exxon began to collect the increased rental on its gasoline sales immediately.[6]

Appellant John W. Rintz is the lessee of an Exxon service station at 700 East Chestnut Street in Lancaster. He operated his station under a one-year lease ending June 1, 1977

---

6. Exxon has since reimbursed Lauer for rental increases collected prior to the stated August 1, 1977 effective date.

at a rental of 1.9 cents per gallon. Although there is a rental reopener clause in Rintz' lease, Exxon did not exercise it. In April of 1977, Exxon submitted to Rintz a new one-year lease with a rental of 2.9 cents per gallon. Rintz refused to execute this lease. On June 2, 1977, Exxon advised Rintz that it would consider him to be a holdover tenant for one year under the same terms as the expired lease. On June 10, 1977, Exxon notified Rintz that pursuant to the extensions and renewals clause of his lease, his rent for the holdover term would be 2.9 cents per gallon, and advised him of his appraisal rights thereunder. However, Rintz did not exercise these rights, and Exxon began to collect the increased rental.

Appellant John J. Kunkel is the lessee of an Exxon service station at 1008 Second Street Pike in Richboro. He operated his station under a one-year lease ending June 7, 1977 at a rental of 1.53 cents per gallon. There is a rental reopener clause in Kunkel's lease, but Exxon did not exercise it. Prior to the expiration of the term, however, Exxon submitted a new one-year lease with an increased rental of 2.5 cents per gallon. Kunkel refused to execute this lease, but did not vacate the premises. On June 8, 1977, Exxon advised Kunkel that he would be treated as a holdover tenant for one year under the same terms as the old lease. Eight days later, Exxon gave notice of a rent increase to 2.5 cents per gallon for the holdover term pursuant to the extensions and renewals clause of the lease, and advised Kunkel of his rights to an independent appraisal. However, Kunkel did not exercise these rights, and Exxon began collecting the rent increases.

As can be seen from the above, the facts underlying appellants' contentions are substantially similar. The appellants have all been, for varying lengths of time, operators of Exxon gasoline service stations who lease their stations from Exxon, paying rent on the basis of gasoline purchased from Exxon. For years, the rentals charged were frozen or regulated by the wage-price freeze of 1971 and the various

Phases thereafter.[7] The controls ended on December 31, 1975, and soon thereafter Exxon increased the station rentals. In several cases where the lease had a rental reopener clause, this was accomplished immediately in mid-lease. In all cases, upon the expiration of the existing leases, Exxon's proposed new leases contained rental increases. None of the lessees agreed to execute these new leases. In each case, Exxon decided to treat the lessees as holdovers for another year's term. This was its right to do by operation of landlord-tenant law. (*See* note 3, *supra*). Then, in each case, Exxon gave notice of its intent to collect the increased rentals during the holdover term, as was its right to do under the extensions and renewals clause in each lease. In each case, Exxon advised the lessee of its right to have the rent determined by an independent appraiser acceptable to both parties, if the lessee objected to the rent increase. In each case, the lessee declined to exercise this appraisal right. Rather, the holdover lessees brought these equity actions to enjoin Exxon from collecting the increases.

Before we turn to the issues at hand, let us first note what is not in contention in this case. None of the appellants' pleadings contend that Exxon has violated its lease.[8] This is not a case of breach of contract. The actions taken by Exxon have been within its powers under the leases. Appellants seek relief under theories outside of contract law to avoid the obligations of their leases.

Appellants first contend in Count II of their complaints that Exxon cannot raise its rents without prior good faith negotiations with the lessees, and cannot unilaterally increase the station rentals solely because the leases permit them to do so, because the parties are in a special franchisor-franchisee relationship.

---

7. Indeed, in several of the cases, the rents stated in the leases had to be decreased to conform to existing controls.

8. There were a few technical errors made in the implementation of the rent increases, all of which were readily corrected by Exxon, so they are not at issue in this litigation. *See* notes 2, 5 & 6, *supra*.

This contention must be measured in the light of the recent decision of our Supreme Court in *Atlantic Richfield Company v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978). Razumic was the operator of an Atlantic Richfield (Arco) service station under a three-year lease which expired on August 1, 1973. Arco notified Razumic on June 29, 1973, that his lease would not be renewed. However, Razumic refused to vacate the premises at the end of the term, and Arco brought an action for possession under the Landlord and Tenant Act before a District Justice. Eventually, Arco won a directed verdict for possession from the court of common pleas. The record did not reveal why Arco no longer wanted Razumic as a dealer,[9] who had been in the business for twenty years, who had in the past been named one of the top ten dealers in the Pittsburgh area, and was once characterized by Arco as an excellent dealer.

The *Razumic* court found that while the parties there were landlord and tenant, their lease and business practices indicated that they also had a franchisor-franchisee relationship. The lease restricted Razumic's use of the premises to that of an automotive retail service station; prohibited subleasing or absentee operation; and prevented Razumic from improving or altering the premises or interfering with the appearance of the Arco trademark thereon. Arco reserved the right to audit Razumic's books in order to check rental calculations and to have final say on all Arco trademark designations on the premises. Razumic was required to operate so as to enhance the reputation and good will of the Arco trademark, including participation in Arco promotions and advertising displays. The evidence showed that Razumic's business practices conformed to these requirements.

Although the lease set forth a three year term of occupancy, there was no express provision granting Arco the

**9.** Eight days before the trial, Razumic moved unsuccessfully to amend his pleadings to allege that Arco's failure to renew his lease was prompted by his unwillingness to adhere to Arco's pricing policies. However, the Supreme Court did not discuss this issue and reached its decision without any evidence of Arco's motive.

right to terminate the parties' relationship at any time.[10] However, the Supreme Court found that because Arco required Razumic to spend much of his time and effort building up good will for the Arco trademark and products, it would be unfair to allow Arco to terminate the franchise. In effect the Court was applying the principle of unjust enrichment to the franchise relationship."[11] To this end, the Court held that franchisors attempting to terminate a franchise relationship must "deal with its franchisees in good faith and in a commercially reasonable manner  .  .  .." (480 Pa. at 378, 390 A.2d at 742). Because no reasons appeared in the record for Arco's termination which met the standard of good faith and commercial reasonableness, the

10. It would appear that under the Landlord and Tenant Act of 1951, Act of April 6, 1951, P.L. 69, art. V, § 501; 68 P.S. § 250.501, Arco's notice to quit was ineffective to preserve the landlord's right to a summary action for possession as sought by Arco, because the notice to quit was sent only one month before the expiration of the three-year term, while the Act requires a three-month notice to quit for leaseholds of one year or more in order to pursue the remedies under the Act.

   At common law, a lease for a term of years expires at the end of the stated term, and notice to quit was unnecessary. *Evans v. Hastings*, 9 Pa. 273 (1848); 51 C.J.S. Landlord & Tenant § 89c, p. 649. However, Arco sought relief under the summary procedures provided by the Act for possession, and therefore should have given the statutory notice. When a tenant for a term of years greater than a term of one year is not given proper notice to quit, and remains in possession after the expiration of the term, he becomes a tenant under a periodic term from year to year. *See Mack v. Fennel*, 195 Pa.Super. 501, 171 A.2d 884 (1961); *Routman v. Bohm*, 194 Pa.Super. 413, 168 A.2d 612 (1961). However, the Supreme Court did not base its decision on the Landlord and Tenant Act, but instead reached their decision on the franchisor-franchisee relationship between the parties.

11. In a franchise arrangement such as there was in *Razumic*, where the lessee's use of the premises is restricted for the protection and enhancement of the reputation and good will of the landlord's trademarks, to allow the landlord arbitrarily to terminate the relationship would deprive the lessee of his own business and goodwill investment and allow the landlord to retain the benefits of the lessee's efforts to enhance the reputation of the lessor's trademarks. As the Supreme Court in *Razumic* said: "A contrary conclusion would allow Arco to reap the benefits of its franchisees' efforts in promoting the goodwill of its name without regard for the franchisees' interest." (480 Pa. at 378, 390 A.2d at 742).

directed verdict in favor of Arco was reversed and the case remanded for trial.[12]

Appellee Exxon presses upon us several reasons why *Razumic* is not applicable to this case, but we find none of them persuasive.

■ Appellee first argues that there is not a franchise relationship between itself and the appellants as there was in *Razumic.* Exxon points out that its leases do not contain provisions restricting appellants' use of the premises to enhance Exxon trademarks. In fact, the Exxon leases all state:

"It is understood that Lessee operates an independent business. Nothing in this lease shall be construed as reserving or granting to Exxon the right to exercise any control over Lessee's business or the manner in which same shall be conducted. . . ."

However, aside from the terms of the lease, each of the appellants' complaints allege the following facts, which of course must be taken as true for the purpose of the appeal:

(1) Exxon has licensed appellants to use its trademarks.

(2) Exxon has exercised strict supervision of quality controls over the products sold under their trademark.

(3) Exxon maintains and exercises a right of inspection over the appellants' stations.

12. It is important at this point to note what the Court in *Razumic* did *not* do. They did not rule that Razumic had a right to continued possession of the service station, or to continue to operate as Arco's franchisee. *Razumic* does not mean that once a gasoline company chooses a franchisee, they are wedded for life. On remand, it appears that if Arco can show that it had good faith commercial reasons for terminating Razumic's franchise, it should win its action for possession.

Moreover, it was crucial to the Court's holding that in the leases between Arco and Razumic, there was no provision giving Arco the express power to terminate the franchise relationship without cause at the end of the lease term. The Court indicated that it might enforce such a provision. *See* 480 Pa. 366, 390 A.2d 736. Thus, it appears that the duty of good faith and commercial reasonableness is used to define the franchisor's power to terminate the franchise only when it is not explicitly described in the parties' written agreements.

(4) Exxon limits the products which appellants can sell at their stations.

(5) Exxon controlled the hours and days that appellants' stations should be open for business.

(6) Exxon supervised every aspect of appellants' business.

(7) Exxon has benefitted by the appellants' creation of goodwill in Exxon trademarks.

We think these facts make out a franchise relationship between Exxon and the appellants here under the standards set forth in *Razumic*. What is important is the actual control of the lessee's business—product limitations, quality controls, hours controls, station inspection—all to protect and enhance the good will of the lessor's trademarks. In light of these facts which show the actual practice of a franchise relationship, we do not think it is significant that the relationship is not explicated in the service station lease.[13]

Exxon next contends that *Razumic* did not create any rights or obligations in the context of service station franchises which are not part of the Gasoline Act.[14] The Gasoline Act, which prohibits franchise terminations except for certain enumerated reasons, does not prevent lessors from raising service station rentals,[15] and in fact provides that a lessor may terminate a lease for nonpayment of rent.[16] The court below found that since Exxon did not terminate appellants' franchises, Exxon did not violate any provision of the Act.

13. Exxon admits that it has executed other agreements with its lessees pertaining to trademarks, credit card sales, and to other incidents of a franchise operation. Exxon's apparent position is that even though a franchise operation exists in fact, and is required or contemplated by various sales agreements between the parties, there still is no "franchise" under *Razumic* unless the relationship is apparent from the service station lease itself. We find this argument to be wholly without merit.

14. Act of November 26, 1975, P.L. 454, No. 126; 73 P.S. § 202–1 et seq. (Supp.1978–79).

15. *See* 73 P.S. § 202–4 (Supp.1978–79) (prohibited practices).

16. 73 P.S. § 202–3(b)(6) (Supp.1978–79).

We think, however, that this argument misapprehends the scope of the *Razumic* decision and the lawmaking functions of a common law court. The operative facts in *Razumic* were not controlled by the Gasoline Act, which the legislature did not choose to make effective until February 22, 1976. Exxon would reduce *Razumic* to an acceleration of the effective date of the Gasoline Act, which a court cannot do. What the Court in *Razumic* did, as a common law court, was make new law in the adjudicative context. The Supreme Court, in support of its decision, simply referred to the Gasoline Act as an argument by analogy. A common law court in making new decisional law is rightly conscious of public policy, and one way to determine public policy is to look at the recent acts of the legislature. However, so long as *Razumic* is not inconsistent with the expressed desires of the legislature, it continues to have precedential effect on subsequently litigated cases, such as the instant case.

Exxon finally argues that *Razumic* is not applicable because it dealt only with the failure to renew a service station lease and ejectment of the franchisee, and should have no relevance to the facts of this case, in which Exxon has renewed all of the appellants' leases and continues to operate in a franchise relationship with them. Again, we think this misapprehends the intended scope of *Razumic.*

Insofar as any court's decision is limited to its facts, then *Razumic* is limited to direct attempts to terminate franchises arbitrarily by refusing, without cause, to renew a lease. However, the Court also found that inherent in the franchisor-franchisee relationship is a duty of good faith and commercial reasonableness on the franchisor to respect the reasonable expectations of its franchisees when the franchisor desires to terminate the franchise relationship. Thus, *Razumic* applies to all cases where the franchisor attempts, either directly or indirectly, to disenfranchise a franchisee.

*Razumic* is not inapplicable here simply because Exxon chose to renew the franchisees' leases rather than eject them. If we were to so hold today, then it would be simple to circumvent the purpose of *Razumic,* which is to protect

the franchisee's interest in the value of his franchise—the continuing good will of his own business. A franchisor, desirous of terminating a franchise, but without good cause to do so, could merely propose an absurdly high rent for the next term, not in good faith to collect more rent, but merely as a bad faith pretext or subterfuge to coerce a lessee out of his franchise. This would allow a franchisor to do indirectly what he cannot do directly under *Razumic,* and this we reject. We hold that *Razumic* also applies to indirect attempts by franchisors to disenfranchise franchisees arbitrarily and in bad faith. Therefore, we must examine the appellants' complaints here to determine if the rental increases were proposed as a bad faith pretext, an indirect attempt to disenfranchise the appellants.

We conclude that appellants have alleged facts which affirmatively reveal that Exxon did not violate the standards of *Razumic,* and have not stated a cause of action for equitable relief based on the franchisor-franchisee relationship between the parties. There are several reasons which prompt this conclusion.

The institution of the rental increases by Exxon was wholly within its rights under explicit lease provisions. This is unlike *Razumic* where the leases did not explicitly reserve a right to terminate the franchise without cause. The Court in *Razumic* thought the absence of such a provision was significant, if not crucial to their decision. Indeed, at one point in the opinion, the Court implied that it would enforce such a termination clause. *Atlantic Richfield Co. v. Razumic, supra,* (480 Pa. 366, 390 A.2d 736). This is consistent with the principles announced in *Razumic,* which applied the standard of good faith and commercial reasonableness to protect the "reasonable expectations" of the franchisee in maintaining his franchise. Where there is no explicit termination clause in his lease, a franchisee indeed has a reasonable expectation that the relationship will not be terminated arbitrarily without cause. However, when the actions of the franchisor are within plain and explicit enabling clauses of the lease, we find it impossible to say that the reasonable

expectations of the franchisee have been violated. Thus, the failure of Exxon to bargain for the rent increases here does not violate the *Razumic* standards, and the fact that the increases were imposed unilaterally can not fairly be said to have upset the reasonable expectations of the appellants.

Nor do we think that the rent increases themselves contravene the standards of *Razumic*. As we have said, *Razumic* deals with the attempt, direct or indirect, to disenfranchise franchisees. It is in the context of an attempted disenfranchisement that the *Razumic* standard of good faith and commercial reasonableness applies to protect the reasonable expectations of the franchisee. Under the circumstances of this case, we find it sufficient under *Razumic* that the rent increases instituted by Exxon were for the good faith purpose of collecting more rent, and were not a bad faith pretext or subterfuge to coerce the appellants into abandoning their franchises. The appellants' complaints nowhere allege that the rent increases were any such bad faith pretext, or that by them Exxon is attempting to force them to abandon their franchises. The gravamen of the complaint is that the rents were instituted without prior bargaining or negotiation, and are higher than the appellants should have to pay.[17] This does not state a cause of action under *Razumic*.

17. It is rather plain from the appellants' own complaints and the exhibits attached thereto that the rent increases were a direct response to the abolition of rent controls by the federal government on the properties in question, and not just a capricious arbitrary decision. It appears that the rent increases were merely the return to free market levels after years of artificial depression. We wish to stress, however, that we are *not* passing upon the reasonableness or fairness of the rent increases themselves, which we could not do on the record before us. More importantly, we do not think that the courts can or should involve themselves in fine-tuning the rentals which gasoline companies charge their service station operators to determine the "most fair" rent in every case where, as one would usually expect, the lessor would like to charge more, and the lessee would like to pay less. Exxon is not a public utility. Nor does *Razumic* empower the courts of common pleas to sit as administrative law judges of an ad hoc, roving Franchise Regulation Agency, to allocate the risks of profit and loss between service station franchisors and franchisees. As we have said, *Razumic* deals with the

Moreover, Exxon demonstrated their good faith in every instance by renewing appellants' leases after appellants refused to execute new leases and held over on the properties. Rather than attempting to eject them as holdovers as would be their right under landlord and tenant law,[18] Exxon treated the appellants as holdover tenants for a year's term. This is not only evidence of good faith, but it means that another crucial element in the *Razumic* case—unjust enrichment—is not present here. The appellants do not claim that they have lost or been threatened with the loss of their franchises.

We also note that in each case, Exxon called to the appellants' attention their right under the lease to have their rents determined for the holdover period by outside appraisal, and that each of the appellants refused to exercise this right. This is further indicative of Exxon's good faith. Furthermore, it is not proper for appellants to seek equitable relief where they have failed to pursue their available contractual remedies.[19]

attempt, direct or indirect, to disenfranchise. It does not bring every aspect of the franchisor-franchisee relationship within the purview of judicial review.

**18.** There would be serious question whether or not Exxon could have successfully ejected appellants consistent with the holding of *Razumic* and the requirements of the Gasoline Act, 73 P.S. § 202–3(c)(1) (Supp.1978–79). However, the issue is academic since Exxon did not attempt to eject the appellants at the close of the lease terms, and has never sought to regain possession of the leased properties.

**19.** It is one of the first maxims of equity jurisprudence that equity aids the vigilant, and not those who slumber on their rights. *Riley v. Boynton Coal Co.,* 305 Pa. 364, 157 A. 794 (1931); 30 C.J.S. Equity § 100, p. 1059. Appellants argue that to do this would have been a vain act since Exxon must approve of any appraisal. However, a reading of the clause (*see* note 4, *supra*) indicates that while the *appraiser* chosen by the lessee must be acceptable to Exxon, Exxon has no veto over his *appraisal*. The appellants also argue, in a conclusory fashion, that the formula for computing the rent contained in the extensions and renewals clause is itself unfair to the lessee, and provides an unreasonably high rent to the lessor. The appellants have not, however, given us anything to show that the formula is unfair except their own bald conclusion. The formula provides that the monthly rental shall be $1/12$ of the following sum:

(1) 10% of the appraised value of the premises, excluding the value of the lease or Exxon's reversionary interest,

In sum, we find that while the *Razumic* decision is applicable to this case, the appellants' allegations affirmatively reveal that Exxon has not violated the principles enunciated in that decision. Rather, the record shows that the rent increases were instituted in good faith to collect more rent, and not as a bad faith pretext to disenfranchise the appellants, and were not outside the reasonable expectations of the franchisees. Next, we must turn to appellant's arguments for reversal not based on the franchisor-franchisee relationship between the parties.

▆▆▆ Appellants contend in Count III of their complaints that the collection of the increased rents should be enjoined because the "rental reopener" and "extensions and renewals" clauses in their leases, as well as the rent increases themselves, were "unconscionable" and therefore should not be enforced. This argument is clearly without merit. Unconscionability may only be asserted as a defense[20] in an action on a contract for the sale of goods.[21] It is not a plaintiff's doctrine available for affirmative relief to enjoin the provisions of a lease of real estate. Moreover, even if the unconscionability doctrine did apply, we must note that rental adjustment clauses in commercial leases have been previously upheld and enforced by our courts, and appellants suggest no reason why businessmen should be prevented from bargaining on the inclusion of such matters in those agreements. *See Pittsburgh Allied Fabricators, Inc. v. Haber,* 440 Pa. 545, 271 A.2d 271 (1970).

(2) one year's actual property taxes collected, and
(3) one year's actual cost of maintenance and repairs to the premises by Exxon.
In effect, the formula provides Exxon with a 10% yearly rate of return on their investment. We cannot say that on its face that this is so obviously an unfair or unreasonable rate of return for commercial real estate as to excuse any attempt by the appellants to exercise their appraisal rights.

20. *See Von Lehn v. Astor Art Galleries Ltd.,* 86 Misc.2d 1, 380 N.Y.S.2d 532, 541 (1976); *W. L. May Co., Inc. v. Philco-Ford Corp.,* 543 P.2d 282, 286 (Or.1975).

21. Act of October 2, 1959, P.L. 1023, § 2; 12A P.S. § 2–302.

Appellants lastly contend that they are entitled to equitable relief for Exxon's violation of the Gasoline Act [22] in Count I of their complaints. The problem with appellants' statutory cause of action is, however, that the complaint fails to set forth any violation of the Act by Exxon. The complaints and appellants' brief indicate that this theory of relief is based upon § 3(c)(1) of the Act, 73 P.S. § 202–3(c)(1) (Supp.1978–79) which states: "Nothing in subsection (b) shall prohibit termination, cancellation, or failure to renew:

"(1) if there is a failure on the part of the lessor supplier and the lessee dealer to agree upon the terms of a renewal agreement where both parties have acted in good faith trying to effect such a renewal . . . .."

The complaints here allege that in each case Exxon sent the appellants, without prior negotiation, a new lease with the unwanted rent increases, and later, without negotiation, instituted these rent increases for the holdover term under extensions and renewals clause. Appellants argue that this attempt to dictate a new lease and rent increase without prior good faith bargaining was in bad faith and therefore violative of § 3(c)(1).

We think that this is a misreading of the Gasoline Act. Section 3(c)(1) does not impose upon franchisors an affirmative duty to negotiate in good faith with its franchisees for lease renewals. It *does* mean that if the franchisor fails to bargain in good faith, then under § 3(b) of the Act, he cannot use the expiration of the old lease to terminate the franchise. Here, it is alleged that Exxon failed to bargain in good faith for the terms of a lease renewal. However, it is not alleged that Exxon used the failure to reach agreement to attempt to terminate appellants' franchises. Rather, in each case Exxon treated the holdovers as tenants for

22. The Act does authorize the granting of equitable relief in the appropriate circumstances of a violation of the Act. *See* 73 P.S. § 202–6 (Supp.1978–79).

another year. Since Exxon did not terminate any of the franchises, and did not engage in any other of the prohibited practices under the Act, the complaints fail to state a cause of action under the Act.[23]

The order dismissing appellants' complaints is affirmed.

PRICE, J., files a concurring statement.

PRICE, Judge, concurring:

I concur in the result reached by Judge Hoffman, however, I cannot agree with the broad sweep and application given to *Atlantic Richfield Company v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978), and *Kowatch v. Atlantic Richfield Company*, 480 Pa. 388, 390 A.2d 747 (1978). Under the facts deemed established in this case, I would hold that there is no franchise relationship between appellants and appellee. The affirmation of the appellee's demurrer should be solely because appellee owes no duties to appellants outside the leases and outside the Pennsylvania Gasoline Act.[1] If this be so, there can be no question of the correctness of the court below in sustaining appellee's demurrer, since, even by the much stricter requirements Judge Hoffman imposes, he finds appellants have not presented a cause of action.

In all other respects I agree with Judge Hoffman.

23. Act of November 26, 1975, P.L. 454, No. 126, § 4; 73 P.S. § 202–4 (Supp.1978–79).

1. Act of November 26, 1975, P.L. 454, No. 126; (73 P.S. § 202–1) *et seq.* (Supp.1978–79).