408 A.2d 521

The AMOCO OIL COMPANY,

v.

Robert F. BURNS, Appellant.

The AMOCO OIL COMPANY, Appellant,

v.

Robert F. BURNS.

Superior Court of Pennsylvania.

Argued June 5, 1979.

Filed Aug. 3, 1979.

Petition for Allowance of Appeal Granted May 16, 1980.

392

Norman P. Zarwin, Philadelphia, for appellant at No. 8 and appellee at No. 59.

William A. DeStefano, Philadelphia, for appellant at No. 59 and appellee at No. 8.

Before PRICE, HOFFMAN and DOWLING, JJ.

HOFFMAN, Judge:

Landlord Amoco Oil Company (Amoco) sued its holdover tenant, Robert F. Burns, in ejectment and trespass for damages and mesne profits caused by Burns' possession beyond the lease term. After a non-jury trial, the court awarded possession to Amoco but denied damages. Both parties filed exceptions, which the lower court denied. Both Burns and Amoco have appealed from the order denying their exceptions.

Amoco purchased the land in question in 1966 and constructed a two-bay gasoline service station thereon. Amoco leased the station to Burns on August 11, 1967. The last lease executed by the parties was for a one-year term ending September 11, 1976, with automatic renewals for two successive one-year terms unless either party gave written notice of cancellation prior[1] to the end of the initial or renewal term. Other provisions of the lease give the parties the right to cancel the lease in mid-term for enumerated "good cause" reasons. The lease automatically renewed itself for the first additional term, but on June 8, 1977, Amoco gave written notice of cancellation of the last additional term and

1. Amoco was required to give 60 days notice for cancellation; Burns was required to give 30 days notice.

directed Burns to vacate the premises effective September 11, 1977. Amoco offered to sell the premises to Burns for $140,000, which he refused. Subsequently Amoco contracted to sell the property to the U-Haul Company of Delaware Valley (U-Haul) for $140,000, contingent upon Burns' timely vacation of the premises. Settlement was scheduled for December 1, 1977, but when Burns refused to surrender possession at the end of the term, U-Haul withdrew its offer and Amoco returned U-Haul's $10,000 deposit. During the pendency of the litigation below, the parties entered into a stipulation without prejudice whereby Amoco continued to sell Burns gasoline and other Amoco products. After entry of its order, the court below granted a supersedeas conditioned upon the positing of $11,000 security bond. However, Burns did not post bond and vacated the premises on or about March 27, 1979.

At trial, Amoco officials testified that during 1976 they decided not to renew Burns' lease because his diminishing volume of sales was making it unprofitable for Amoco to maintain the station.[2] An Amoco economic analyst testified that Amoco lost $2,000, $7,109, and $11,840, in 1975, 1976, and 1977, respectively on Burns' station. Burns testified that the lack of business at his station was not due to any dereliction of his own, but was due to Amoco's failure to take the following steps to improve business: (1) construct a high rise sign to attract passing motorists from the recently constructed Interstate Highway 95; (2) convert one island into self-service pumps,[3] and (3) reduce the price of gasoline sold to him so he could engage in effective price competition with other nearby stations. Regarding this evidence, the court found as follows: "Executive personnel of the corpora-

[2]. In his best year, 1972, Burns sold 256,138 gallons of gasoline. He sold 251,852 gallons in 1973, but in 1974, sales dropped to 205,668 gallons. In 1975 and 1976, sales plummeted to 129,805 and 105,864 gallons, respectively.

[3]. Eventually Burns installed a self-service island at his own expense. In the eleven months afterward, he sold 82,934 gallons of gasoline. This represented a slight increase in sales, but still was no better than the volume sold in 1976.

tion stated the reasons why these actions were not taken and the court concludes that the decisions were made in accordance with good faith business judgment. The weight of evidence is that even if [Amoco] had complied with [Burns'] requests in these areas, the resulting effect would be insufficient to warrant continuing the operation of the business."

■ Although the parties' last executed lease agreement was on September 11, 1975, prior to the effective date of the Gasoline Act,[4] the Act nonetheless is applicable to the instant case because it was renewed on September 11, 1976, after the effective date of the Act. *See* 73 P.S. § 202–5.

■ Burns contends that Amoco's cancellation of his lease was illegal under the Act because none of the specific grounds for cancellation permitted by the Act existed in this case. Amoco concedes as much but relies upon the following provision of the Act: "Nothing . . . shall prohibit termination, cancellation, or failure to renew: . . . where there is such cause for termination as a court of competent jurisdiction might find to be reasonable and just under all the circumstances." 73 P.S. § 202–3(c)(3). The court below thought that the unprofitability of a franchise for a franchisor was reasonable cause for termination, and we agree.[5] Therefore, we conclude that Amoco's termination of Burns' lease was not in violation of the Gasoline Act.

4. Act of November 26, 1975 P.L. 454, No. 126, § 1; 73 P.S. § 202–1 *et seq.*, effective February 24, 1976.

5. To escape the force of this position, Burns makes three arguments.
   First, he contends that termination for unprofitability is not just under all the circumstances here because the unprofitability was caused by Amoco's failure to take affirmative steps to improve the situation. This argument overlooks the finding below that even if Amoco had taken the measures requested by Burns, they would not have made his station profitable. There is sufficient evidence in the record to support this finding. We note that even after Burns installed his self-service island, his sales, which were somewhat improved, were still no better than in 1976, and still substantially below his peak years of 1972 and 1973. *See* notes 2 and 3 *supra*.
   Secondly, Burns raises several objections to the methodology employed by Amoco's economist in determining the profitability of a

■ Burns next contends that Amoco did not deal with him in a commercially reasonable manner, terminating his lease in bad faith and in derogation of his reasonable expectations. *See Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978). Because Amoco is attempting to terminate Burns' franchise by this ejectment action, we must consider the effect of the *Razumic* decision on this case. *Compare Witmer v. Exxon Corp.*, 260 Pa.Super. 537, 394 A.2d 1276 (1978) (mere attempt to collect higher rent and not to terminate franchise).

In *Razumic*, the franchisor did not explicitly reserve a right to terminate the franchise without a cause. "The Court in *Razumic* thought the absence of such a provision was significant, if not crucial to their decision. Indeed, at one point in the opinion, the Court implied that it would enforce such a termination clause." *Witmer v. Exxon Corp.*, 260 Pa.Super. at 554, 394 A.2d at 1285. "[I]t appears that the duty of good faith and commercial reasonableness is used to define the franchisor's power to terminate the franchise only when it is not explicitly described in the parties' written agreements." *Id.*, 260 Pa.Super. at 551 n. 12, 394 A.2d at 1283, n. 12.

Here, the lease between Amoco and Burns specifies that either party could cancel the lease at the end of the original or renewal term with prior written notice, without limitation as to reasons or cause. Additional rights of cancellation in mid-term for cause are specified elsewhere in the lease. Because Amoco explicitly reserved the power to terminate without cause in the lease, the *Razumic* standards do not apply to its termination of Burns' franchise. Thus, we need

service station to Amoco. However, none of these questions were raised on cross-examination of that witness, so they are waived.

Lastly, Burns argues that unprofitability cannot be a cause for termination under the general language of Section 3(c)(3) because the Act specifically prohibits termination for "[f]ailure by the lessee dealer to meet sales quotas suggested by the lessor supplier." 73 P.S. § 202–3(d)(2). However, the record nowhere indicates that Amoco ever gave Burns any quota of gasoline sales. The record is clear that Amoco decided to terminate Burns' franchise because of its unprofitability, and not because its gasoline sales fell below any particular amount.

396

not consider whether cancellation of a franchise for unprofitability is in bad faith or commercially unreasonable.

Amoco has also appealed from the court's failure to award damages and mesne profits from Burns' wrongful possession of the premises. Amoco claims that it continued to lose money on the station while Burns operated it pursuant to the parties' stipulation until he vacated the premises near the end of March, 1979, and that it lost the benefit of its bargain with U-Haul because of Burns' failure to quit the premises at the end of his term.

While damages and mesne profits may be recovered in an ejectment action, *Doyle v. Goldman*, 407 Pa. 269, 180 A.2d 51 (1962), the recovery is equitable in nature, and may be denied where the defendant is a *bona fide* occupant under color of title. *Ege v. Kille*, 84 Pa. 333, 340 (1877). Here, the lower court concluded that allowing recovery of damages was not equitable since Burns was remaining in possession under color of title (a leasehold interest arguably protected from termination by *Razumic* or the Gasoline Act) all the while retailing Amoco products and otherwise performing his lease obligations. Under these circumstances, we find no abuse of discretion in failing to award money damages to Amoco.

Orders affirmed.