437 A.2d 381

**The AMOCO OIL COMPANY**

v.

**Robert F. BURNS, Appellant.**

Supreme Court of Pennsylvania.

Argued April 22, 1981.

Decided July 2, 1981.

338

Norman P. Zarwin, Philadelphia, for appellant.

William A. DeStefano, Philadelphia, for appellee.

## OPINION OF THE COURT

KAUFFMAN, Justice.

After a non-jury trial in the Bucks County Court of Common Pleas, appellee, Amoco Oil Company ("Amoco"), was awarded possession of a gasoline service station by judgment in ejectment against appellant, Robert F. Burns ("Burns"), an Amoco dealer who had refused to vacate the property after the expiration of his lease. Burns' exceptions to the adjudication were overruled by the Common Pleas Court *en banc* and the Superior Court affirmed, 268 Pa.Super. 390, 408 A.2d 521 (1979).[1]

Appellant contends here, as he did in the courts below, that Amoco was precluded from terminating his franchise either by this Court's decision in *Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978),[2] or by the Pennsylvania Gasoline Act.[3] We disagree and affirm the judgment of the Superior Court.[4]

Amoco purchased the land in question in 1966 and thereupon constructed a two bay gasoline service station at a total cost in excess of $125,000. The property was then

1. Amoco's claim for damages was rejected by the trial court and by the Superior Court on cross-appeal, and has not been pursued in this appeal.

2. *Razumic* held that in the absence of a provision in a franchise agreement authorizing termination or non-renewal without cause, a franchisor must act in good faith and in accord with the franchisee's commercially reasonable expectations in terminating a franchise relationship.

3. Act of November 26, 1975 P.L. 454, No. 126, § 1; 73 P.S. § 202–1 *et seq.*, effective February 24, 1976 ("The Gasoline Act"). The Gasoline Act limits the circumstances under which an oil company may terminate its relationship with a lessee-dealer.

4. Jurisdiction is vested in this Court pursuant to the Judicial Code, Act of July 9, 1976, P.L. 586, No. 142, § 2. 42 Pa.C.S.A. § 724(a).

leased to Burns as an Amoco dealership which was maintained pursuant to a series of written leases, the last of which was for a one-year term ending September 10, 1976, with automatic renewals for two successive one-year terms unless either party gave written notice of cancellation prior to the end of the initial or renewal term.[5] The lease automatically renewed itself for the first additional term, but on June 8, 1977, Amoco gave written notice of nonrenewal, and directed Burns to vacate the premises effective September 10, 1977.[6]

At trial, Amoco officials testified that they decided not to renew Burns' lease and to divest themselves of the property because Burns' steadily decreasing sales volume had made it unprofitable for Amoco to maintain the station.[7] In response, Burns contended that the diminishing sales volume of the station and its resultant unprofitability were due to

**5.** Unlike the "Dealer Lease" in *Razumic*, the agreement here provided that either party could terminate at the expiration of any term, without limitation as to reason or cause, upon specified notice to the other party. Amoco was required to give 60 days notice for cancellation; Burns was required to give 30 days notice. Other provisions of the lease gave the parties rights of cancellation "for cause" *during* the initial or any renewal term.

**6.** Amoco did not seek to *replace* Burns and continue operation of a service station. Prior to June 8, 1977, Amoco offered to sell the property to him for its appraised value of $140,000. Burns rejected the offer, however, and Amoco subsequently contracted to sell the property to the U–Haul Company of Delaware Valley ("U–Haul") for $140,000, contingent upon Burns' timely vacation of the premises. Settlement was scheduled for December 1, 1977, but when Burns refused to surrender possession at the end of the lease term, U–Haul withdrew its offer and Amoco returned the $10,000 deposit. In October, 1977, Amoco initiated its action in ejectment and trespass.

**7.** In his best year, 1972, Burns sold 256,138 gallons of gasoline. He sold 251,852 gallons in 1973, but in 1974, sales dropped to 205,668 gallons. In 1975 and 1976, sales decreased to 129,805 and 105,864 gallons, respectively. Amoco's documents and testimony showed that in 1977, Burns' station ranked last in profitability among the more than four hundred Amoco stations in the Baltimore sales district, and, in fact, that Amoco had incurred a net loss of over eleven thousand dollars on the operation of the station in that year. Losses also had been incurred in 1975 (two thousand dollars) and 1976 (over seven thousand dollars).

Amoco's failure to take the affirmative steps which he had requested, and not to any dereliction on his part.[8] He thus argued that Amoco's claim of unprofitability as a justification for termination of the franchise was neither commercially reasonable nor made in good faith, and, therefore, that termination was in violation of the *Razumic* principles, *supra*, n.3; he further contended that termination was illegal because of the absence of any of the specific grounds for cancellation enumerated in Section 202–3(b) of the Gasoline Act.[9]

The trial court, however, held that Amoco's decisions in connection with the operation of Burns' station were made in accordance with good faith business judgment; that, in any event, the evidence showed that compliance with Burns' requests would not demonstrably have improved the station's sales volume; and, therefore, that the unprofitability of Burns' franchise was a commercially reasonable justification for termination under *Razumic*.[10] The court also concluded that Amoco's decision to cancel Burns' lease was proper under the Gasoline Act because unprofitability was sufficient cause for termination under Section 202–3(c), which provides:

> (c) Nothing . . . shall prohibit termination, cancellation, or failure to renew:

. . . . .

8. Burns charged that Amoco should have (1) constructed a high-rise sign to attract passing motorists from the recently constructed Interstate Highway 95; (2) reduced the tank wagon price of gasoline sold to him; and (3) supplied him with a self-service island.

9. The Gasoline Act is applicable to this case because the lease was renewed in September, 1976, following the effective date of the Act.

10. In its Opinion, the trial court noted:
   "Executive personnel of the corporation stated the reasons why these actions were not taken and the court concludes that the decisions were made in accordance with good faith business judgment. *The weight of the evidence is that even if [Amoco] had complied with [Burns'] requests in these areas, the resulting effect would be insufficient to warrant continuing operation of the business.*" (Emphasis supplied)

(3) where there is such cause for termination as a court of competent jurisdiction might find to be reasonable and just under all the circumstances.

The Superior Court concluded: (1) that the evidence was sufficient to sustain the trial court's findings; (2) that it need not decide whether the termination here was in accord with the *Razumic* standard of good faith and commercial reasonableness, because, unlike *Razumic*, the right to terminate the relationship without cause was reserved by the parties in their written agreement; and (3) that unprofitability of the franchise was a reasonable and just cause for termination under Section 202-3(c) of the Gasoline Act.[11] We agree.

## I

In *Razumic*, the Atlantic Richfield Company ("Arco") sought to terminate its dealership agreement without cause at the end of a three year lease term. Arco contended that the parties had contemplated an ordinary landlord and tenant relationship, terminable by either party upon expiration of the term of occupancy; Razumic argued that his "Dealer

11. In its well-reasoned Opinion, the Superior Court correctly rejected Burns' contentions to the contrary:

"[His] argument overlooks the finding below that even if Amoco had taken the measures requested by Burns, they would not have made his station profitable. There is sufficient evidence in the record to support this finding. We note that even after Burns installed his self-service island, his sales, which were somewhat improved, were still no better than in 1976, and still substantially below his peak years of 1972 and 1973 . . .

Secondly, Burns raises several objections to the methodology employed by Amoco's economist in determining the profitability of a service station to Amoco. However, none of these questions was raised on cross-examination of that witness, so they are waived.

Lastly, Burns argues that unprofitability cannot be a cause for termination under the general language of Section 3(c)(3) because the Act specifically prohibits termination for "[f]ailure by the lessee dealer to meet sales quotas suggested by the lessor supplier." 73 P.S. § 202-3(d)(2). However, the record nowhere indicates that Amoco ever gave Burns any quota of gasoline sales. The record is clear that Amoco decided to terminate Burns' franchise because of its unprofitability, and not because its gasoline sales fell below any particular amount." 408 A.2d at 523, n.5.

Lease," which did not confer upon Arco the right to terminate the relationship without cause, embodied a franchise agreement which Arco could not terminate at will. In agreeing with Razumic, we emphasized that although the writing expressly authorized him to terminate *without reason* upon proper notice at the end of a term, Arco expressly was given the right to terminate only for limited business reasons.[12] Under all the circumstances, we found the absence of a provision authorizing Arco to terminate without reason to be "striking," 480 Pa. at 377, 390 A.2d at 741, and held that the terms of Razumic's leasehold established a right of occupancy which could be terminated by Arco only if consistent with principles of good faith and commercial reasonableness. We specifically declined, however, to decide whether our holding would extend to those cases where petroleum suppliers have reserved the right to terminate franchise agreements with their dealers without cause. 480 Pa. at 379, n.8, 390 A.2d at 742, n.8.

■ In the present case, Burns' lease contained a clear and unambiguous provision permitting termination by either party without cause on proper notice at the end of the original or renewal term. We conclude that this provision renders the *Razumic* standard inapplicable, and that the Superior Court thus correctly noted, ". . . the duty of good faith and commercial reasonableness is used to define the franchisor's power to terminate the franchise only when it is not explicitly described in the parties' written agreements." 268 Pa.Super. 390, 408 A.2d at 524.

## II

■ Although the lease provision here would not in itself be adequate to satisfy the termination or non-renewal re-

12. We further noted that Arco and Razumic had executed a separate writing authorizing Razumic to use Arco's property to the rear of the service station for parking rental vehicles which the Hertz Corporation authorized Razumic to rent to the public. We concluded that the fact that this writing conferred upon both parties the right to terminate upon thirty days notice "with or without cause" underscored the absence of a similar provision governing Arco's right to terminate the "Dealer Lease."

quirements of Section 202–3 of the Gasoline Act, we conclude, as did both the trial court and the Superior Court, that a franchisor's good faith decision to divest itself of an unprofitable property may be a "reasonable and just" cause for termination, cancellation or failure to renew as contemplated in Section 202–3(c)(3), *supra*.[13] Burns argues that non-renewal would be "reasonable and just" under the Gasoline Act only if it had been shown that the station's unprofitability was caused by his own mismanagement, rather than by other factors. We disagree.[14] In adopting the Gasoline Act, the Legislature did not intend to preclude oil companies from disposing of business ventures found in good faith to be unprofitable through no fault of their own.[15]

Our view is strongly supported by the federal statute controlling in this area, the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq. ("the Petroleum Act") which, while not directly applicable to this case, is instructive in revealing Congress' view as to what would be considered reasonable and just causes for termination of a service station franchise.[16] Section § 2802(b)(3) of the Petroleum Act provides:

> (3) . . . the following are grounds for nonrenewal of a franchise relationship:

13. We emphasize that the record here adequately supports the finding that Amoco did not intentionally cause the unprofitability of the property, nor did it unreasonably refuse to take any action which would have achieved profitability.

14. If Amoco had sought to *replace* Burns' or to assume operation of the station itself, his position might have arguable merit. Here, however, Amoco sought only to close the station and to divest itself of a property which had become a financial liability.

15. Nor could it constitutionally do so, lest it effect a deprivation of property without due process of law. *See*, e. g. *Democratic Central Committee v. Washington Metropolitan Area Transit Commission*, 436 F.2d 233, 35–36 (D.C. Cir. 1970); *Consumer Oil Corp. of Trenton v. Phillips Petroleum Co.*, 488 F.2d 816, 819 (3d Cir. 1973); Cf. § 2802 (b)(3)(D)(i)(IV) of the Federal Petroleum Marketing Act, 15 U.S.C. § 2801 et seq., *infra*.

16. The Petroleum Act will supersede and pre-empt any state statute covering the same subject matter in cases arising after its effective date, June 19, 1978. 15 U.S.C. § 2806(a).

. . . .

(D) ... a determination *made by the franchisor in good faith and in the normal course of business*, if—

(i) such determination is—

(I) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel,

. . . .

(III) *to sell such premises*, or

(IV) that *renewal* of the franchise relationship *is likely to be uneconomical to the franchisor* despite any reasonable changes or reasonable additions to the provisions of the franchise which may be acceptable to the franchisee ... (Emphasis supplied)

We conclude that Amoco's refusal to renew Burns' lease was reasonable and just under all the circumstances. Accordingly, the judgment of the Superior Court is affirmed.

O'BRIEN, C.J., did not participate in the consideration or decision of this case.