TEMP–WAY CORPORATION, Denis J. Spellman, and Martin F. Spellman

v.

CONTINENTAL BANK, Ronald Vicari, Frank Leis, and Francis Conway

v.

Mary Ellen SPELLMAN and Leslie F. Spellman.

Civ. A. No. 87–6930.

United States District Court, E.D. Pennsylvania.

March 13, 1992.

See also 95 B.R. 343.

Janet M. Sonnenfeld, Harry R. Blackburn, Kathleen M. Smith, Jayne M. Billinson, Blackburn, Michelman & Tyndall, P.C., Philadelphia, Pa., for plaintiffs.

Andrew Bershad, Edward I. Swichar, Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for defendants.

## DECISION AND ORDER

BECHTLE, Chief Judge.

The instant lender liability action stems from the financial harm allegedly suffered by Temp–Way Corporation ("Temp–Way") and Denis J. Spellman and Martin F. Spellman ("the Spellmans"), resulting from a banking relationship with Continental Bank ("Continental") and several of its officers and employees, namely, Ronald Vicari, Frank Leis, and Francis Conway (the "defendants").[1] Temp–Way and the Spellmans (hereinafter collectively referred to as "plaintiffs") assert claims for breach of fiduciary duty, breach of financing agreement, business coercion and economic duress, fraud, intentional interference with contractual relations and negligent misrepresentation. Temp–Way alone seeks a determination of its secured status or, alternatively, its debt set-off.

The case was tried over ten days, from February 21, 1991 through March 6, 1991. The testimony comprised over 1,500 pages of transcript and the parties submitted close to 500 exhibits. The parties submitted requests for findings of fact and conclusions of law, together with briefs on the legal issues. Based on the pleadings, proof, and written submissions of the parties, the plaintiffs cannot prevail on their claims.

Continental included in its answer a three Count counterclaim and set-off naming Temp–Way, the Spellmans and Mary Ellen Spellman and Leslie Spellman (the

---

1. Plaintiff Temp–Way Corporation was organized and licensed to do business under the laws of the Commonwealth of Pennsylvania. Temp–Way instituted this lawsuit after having filed a petition under Chapter 11 of the United States Bankruptcy Code on April 1, 1987. Bankruptcy case No. 87–015615 (Bky.E.D.Pa.). By Order dated March 23, 1989, the Bankruptcy Court converted the case to a case under Chapter 7 of the United States Bankruptcy Code. A Chapter 7 Trustee was appointed on March 31, 1989. By Order dated November 21, 1989, the Bankruptcy court ordered the Trustee to abandon this lawsuit as an asset of Temp–Way's bankruptcy estate.

"Spellman wives") as defendants. Count I of Continental's counterclaim and set-off asserts a claim against Temp–Way and the Spellmans for fraud. Count II of Continental's counterclaim seeks judgment against Temp–Way for amounts due and owing under various loan agreements, plus interest and attorney's fees. Count III of Continental's counterclaim alleges that the Spellmans and the Spellman wives are in default and liable under the Unlimited Surety Agreement, which they executed in their personal capacity, and seeks recovery, by way of set-off, or otherwise, of a sum in excess of $900,000, plus interest and attorney's fees. For the reasons discussed below, Continental does not prevail on Count I of its counterclaim but does prevail on Counts II and III.

## FINDINGS OF FACT

### Temp–Way Corporation and The Calcaras

1. Temp–Way, a Pennsylvania corporation, was formed in 1966 by Joseph Calcara, Leslie Weinstock and Jack Gill as a heating, ventilation and air conditioning company ("HVAC"). Temp–Way's operations included the installation, servicing, and parts distribution of HVAC systems. The operations largest component was service.

2. Temp–Way's banking relationship with Continental Bank began in 1966 when Temp–Way established a banking relationship with Continental's predecessor, Bank of Italia.

3. The Calcaras first met defendant Ronald Vicari in the mid–1960's. Vicari was then, and at all relevant times has been, a senior vice-president of Continental. Dolores Calcara, Joseph Calcara's wife, knew Vicari's wife, and Vicari's mother was a Temp–Way customer. From time to time, the Calcaras consulted with Vicari on an informal basis with regard to the management and financial condition of Temp–Way.

4. In 1975, Temp–Way moved from Porter Street in Philadelphia to Lindbergh Boulevard, Philadelphia, Pennsylvania. The building on Lindbergh Boulevard (the "Lindbergh Property") was built from the ground up and financed by the Pennsylvania Industrial Development Corporation ("PIDC") with Continental as the participating bank. Vicari facilitated the meeting between Temp–Way, Continental and PIDC, and Continental was the Mortgagee of the Lindbergh Property.

5. Beginning in 1977–1978, Dolores Calcara participated in Temp–Way's day-to-day operations on an irregular basis. By 1982, Dolores Calcara became Temp–Way's president.

6. In the latter part of the 1970's or early part of the 1980's, the original Temp–Way ownership group disbanded leaving the Calcaras in control. The Calcaras, thereafter, decided to sell the business. Dolores Calcara answered an advertisement placed in a trade journal in mid–1983 by the Spellmans, who were seeking to buy a medium-sized HVAC company.

7. On October 18, 1983, Dolores Calcara wrote to Vicari and stated in relevant part, the following:

The probability of the sale [of Temp–Way] has grown more positive in the past two weeks. The potential buyers, even to my very guarded eye, are serious and stable. They have informed us that they do have a financing source on line. They have not committed to it as yet as they intend to pursue other sources to be certain of the most advantageous deal, interest wise. They had not yet met with Mr. Lynch of Continental but say they still plan to. I know I have not violated their confidence or spoiled any plans in telling you in advance of their intention. My trust in you and your discretion is implicit.

We have agreed, in principal, to a stock purchase, to a price, and to an employment contract for Mr. Calcara. All the paperwork will be drawn by their representative based on full and accurate disclosure. We shall turn over Temp–Way graciously and honorably. When, and if, finalization is at hand you shall be totally informed to the extent you may want either as banker or friend, or both.

I want this to happen very much. I want it for several reasons, all good and positive. I have convinced Mr. Calcara it is not only the right thing to do, it is the right time to do it. You once said to know the time to let go. All my instincts say it is now that time to pass on to the next time of life. I would be most grateful for any assistance you might contribute to help make this happen. ...

Letter dated October 18, 1983 from Temp–Way's Dolores Calcara to Vicari at Continental (Plaintiffs' Exhibit 10). The letter did not identify the Spellmans as the potential buyers. As of the date of the letter, the Spellmans had not met with any personnel from Continental.

8. Temp–Way's cash flow was consistently poor, and by October 11, 1983, payments to Continental for Temp–Way's mortgage were three months in arrears. Continental sent Temp–Way a form letter notifying it of the delinquency and requesting that it remit the $7,159.20 mortgage payment for August, September, and October, 1983. Payment for the mortgage held by Continental was always the last bill that Temp–Way paid. Typically, Dolores Calcara would wait for a delinquency notice from Continental before paying the bill to bring Temp–Way current.

*The Spellmans*

9. Denis Spellman graduated from the University of Scranton in 1970 and worked in the field of education. Before joining Temp–Way, Denis Spellman was employed for five years as vice president of marketing and sales by Sosmetal Products, a national distributor of industrial and maintenance supplies and tools.

10. Martin Spellman had experience in estimating and sales in the mechanical contracting field. Prior to his involvement with Temp–Way, he was employed with Catalytic, Inc., an engineering contractor.

11. In late 1983, or early 1984, Denis Spellman consulted with Steven Deviney, a certified public accountant, employed by Zelenkofske–Axelrod & Company ("Zelenkofske"), concerning Temp–Way's acquisition. Steven Deviney reviewed Temp–Way's financial statement for the calendar year ending 1983. Pursuant to that review, Deviney considered the financial condition of the company, including the "tax value" of Temp–Way's $442,219 net operating loss carryforward from the years 1980, 1981, 1982, 1983, and 1984. *See* Temp–Way's Financial Statements, December 31, 1983 (Plaintiffs' Exhibit 19). At that time, Deviney informed Denis Spellman that Temp–Way's financial condition did not merit the $1,000,000 asking price. (2/28/91 N.T. 72). Deviney told Denis Spellman that the working capital ratios of the company were too high because the current payables exceeded the current assets. Deviney further advised that unless the working capital ratios were reduced by converting the current portion of Temp–Way's liabilities to long-term debt, Temp–Way would be using current revenues to pay off old liabilities. Deviney recommended that the Spellmans go forward with the purchase if there was an infusion of working capital and Temp–Way's payables were converted to long-term debt.

12. In January, 1984, Vicari received from E.V. Caruso, vice chairman of Continental's board, Temp–Way's yearly management review write-up which was prepared by Timothy Abell and Cathy Williams of Continental's credit department. The report enumerated the bank's assessment of Temp–Way's financial strengths and weaknesses. Specifically, the write-up noted Temp–Way's continued profitability despite the decline in sales and the guarantors' financial strength. The four stated weaknesses were: 1) the company's deteriorated liquidity and capital position; 2) the rate shortage on customer profitability; 3) the stale personal financial statements; and 4) the fact that the offering basis loan had not paid out since 1978.

13. Between December, 1983 and April, 1984, Vicari met with the Spellmans several times. In the course of those discussions, Vicari suggested that Temp–Way was not in a position for a leveraged buy-out unless the purchasers could provide substantial financing or assets. Vicari also stated that Temp–Way was mismanaged and that it continued to survive because the Calcaras'

personal property was sufficient to collateralize the Continental loans. Further, Vicari advised the Spellmans that Temp–Way's present asset position would not permit additional borrowing.

14. Despite Temp–Way's financial shortcomings and the Spellmans' own inability to finance the company's purchase, the Spellmans and the Calcaras signed a letter of intent concerning the stock purchase by the Spellmans, dated January 12, 1984. The letter of intent, drafted by Spellmans' counsel, provided that the Spellmans would purchase Temp–Way for $350,000, comprising of $35,000 cash, an execution of a promissory note in the amount of $180,000, and assumption of payments under a promissory note (the note was secured by company assets) in the amount of $135,000 payable to Wyncote Financing Company. The letter of intent declared the Spellmans' intention to acquire the Temp–Way stock and was contingent upon their obtaining a twenty-year loan for $575,000. The letter of intent also stated that the Spellmans would provide a minimum of $100,000 of working capital to Temp–Way at closing. Finally, the letter of intent stated, "[it] is expressly understood that this letter is not binding and the Buyer's obligation to purchase and the Seller's obligation to sell the Stock shall in all respect be subject to the negotiation, execution and delivery of a written Agreement." Letter of Intent dated January 12, 1984 (Defendants' Exhibit 18).

15. Before becoming Temp–Way employees the Spellmans assisted Joseph Calcara in the preparation of three contract bids for the Department of Navy ("Navy contracts") totalling over $1,700,000.

16. The $1,700,000 represents three separate Navy contracts in the amounts of $1,049,556, $357,111 and $294,403. The contracts were bid on March 27, March 29 and May 11, 1984, respectively, and officially awarded to Temp–Way in June, 1984. The Spellmans learned that Temp–Way was the low bidder on two of three contracts prior to April 1, 1984, the date they officially became Temp–Way's employees.

17. By early March, 1984, the Spellmans' counsel had already prepared a first draft of the Temp–Way stock purchase agreement.

18. In early 1984, Denis Spellman presented Vicari with a loan proposal to fund Temp–Way's purchase. Vicari denied the Spellmans' request for funds to finance Temp–Way's purchase through Continental, but he suggested that the Spellmans contact Richard Rabner of Richard H. Rabner and Associates, Inc. ("Rabner"), whose company was recently certified to underwrite Small Business Administration Loans.

19. On March 21, 1984, Denis Spellman sent Rabner a copy of the Loan Proposal/Business Plan which Vicari had rejected in early 1984. *See supra* ¶ 18. Included in the submission to Rabner were Temp–Way's financial projections which were prepared with Steve Diviney's assistance. Letter to Rabner (Defendants' Exhibit 19). Pursuant to their request for assistance in obtaining financing, the Spellmans agreed to pay Rabner a fee of five percent of the gross amount of the financing actually acquired. The SBA, thereafter, informed the Spellmans that the SBA would not provide a loan to fund Temp–Way's purchase.

20. Vicari introduced Denis Spellman to Abell of Continental's SBA processing department in March, 1984. At that meeting, Denis Spellman informed Vicari that Temp–Way would need credit at a minimum of $500,000 to support Temp–Way's working capital needs.

*The Spellmans Become Temp–Way Employees and Begin Pursuing SBA Contract–Based Financing for the Three Navy Contracts*

21. The Spellmans became Temp–Way employees, but not yet Temp–Way officers, on April 1, 1984. On that day the company had four outstanding demand notes totaling $475,000 with Continental which were collateralized by the Calcaras' personal property and the Lindbergh Property.

22. When the Spellmans became Temp–Way employees on April 1, 1984, there was no formal change in the ownership of the company and Dolores Calcara remained as

Temp–Way's president. Denis Spellman was responsible for the day-to-day management and financial affairs and for setting and implementing Temp–Way's short and long-range financial goals. Martin Spellman, on the other hand, was responsible for estimating contracts and sales.

23. Soon after the Spellmans became Temp–Way employees, in April 1984, an IRS agent visited Temp–Way and threatened to lock its doors. Although Denis Spellman was aware that Temp–Way owed the Internal Revenue Service approximately $75,000 for delinquent taxes, he was surprised by the fact that there was an additional $50,000 in interest and penalties due.

24. Continental's SBA loan department offered contract-based financing to small businesses that were performing work on assignable government contracts. The SBA guaranteed loans were not directly funded by the SBA, but, rather, Continental and the SBA acted as partners in that Continental provided the funds and the SBA provided the bank with a ninety-percent loan guarantee in the event the borrower defaulted.

25. In an effort to obtain SBA contract-based financing for the three Navy contracts, the Spellmans began working with Continental's SBA loan processors in April, 1984. The joint participation program required that both Continental and the SBA approve the loan to Temp–Way before the funds were released. This meant that Temp–Way was obligated to satisfy all the conditions set forth by Continental and the SBA before any funds would be available.

26. The purpose of the SBA guaranteed loan was to fund labor and material costs as work on the contracts progressed. Interest charges on the loans commenced only after the funds were disbursed. In order to obtain the SBA's approval, each loan application had to be supported by an identifiable contract.

27. Denis Spellman worked with Abell of Continental's SBA loan department to prepare the cash flow projection for the SBA loan application. Denis Spellman projected that Temp–Way would need loans of $312,000 to complete the three Navy contracts.

28. Separate and apart from the SBA guaranteed loan, on or about May 8, 1984, Continental loaned Temp–Way $100,000 pursuant to a non-discount note executed by Dolores Calcara and secured by the Calcaras' personal property on Lagoon Drive, Margate, New Jersey. Upon granting the loan, Vicari advised the commercial credit department that "the [$100,000] financing shall enable the borrower to complete several new lucrative contracts awarded by government agencies." Memo from Vicari to Continental's Commercial Credit Department (Plaintiffs' Exhibit 34). Temp–Way used part of the proceeds from the $100,000 non-discount note to pay off its mortgage delinquencies to Continental.

29. At the same time the Calcaras executed the $100,000 note, they jointly executed two mortgage agreements on their personal real estate holdings for the benefit of Continental in the sum of $350,000. In addition Joseph Calcara personally executed an unlimited surety agreement with Continental for the benefit of Temp–Way.

30. Three days after the note was executed, on May 11, 1984, Dolores Calcara, on behalf of Temp–Way, issued a check to Continental in the amount of $14,318.40 which represented six delinquent mortgage payments and late charges on the Lindbergh Property.

31. Temp–Way commenced working on two of the three Navy projects in June, 1984. Continental was aware that work on these projects was underway and start-up capital was required.

32. By August 1984, approximately two months after work on Temp–Way's Navy contracts had begun, Denis, Martin and Robert Spellman,[2] along with the Calcaras, submitted the SBA loan application to Continental. The Spellmans represented on

---

**2.** Robert Spellman, Denis and Martin Spellman's brother, executed the first SBA application. He, however, is not a party to the instant action. Any reference to the Spellmans refers only to Denis and Martin Spellman.

the SBA loan application that they were equity owners of Temp–Way even though they had not yet executed the stock purchase agreement.

33. During the summer of 1984, Temp–Way experienced serious cash flow problems. Denis Spellman advised both Vicari and Abell of Temp–Way's urgent need for the SBA funds. While the SBA guaranteed loan was being processed, Temp–Way stretched out payments to vendors and attempted to bridge the working capital shortfall by funding the payroll and other costs associated with the three government projects with service and commercial contract revenues from other Temp–Way projects.

34. On or about September 25, 1984, Denis Spellman, on behalf of Temp–Way, received a letter from Abell which outlined the terms by which Continental would consider and process Temp–Way's SBA loan application. Denis Spellman signed the letter on September 27, 1984. Among other things, the letter stated that the bank may decline the loan, terminate the processing of the loan and/or withdraw the loan commitment if the SBA declines to issue its guarantee or if the bank believes that a material deterioration in financial condition of the borrower or any guarantor has taken place. Further, the letter stated that Continental is under no obligation to consider the loan application within any specified period of time.

35. In the fall of 1984, Daniel M. Sossaman, an economic development specialist employed by the SBA in its SBA Guarantee Program for contract-based loans, was responsible for reviewing and processing SBA loan applications. Before a SBA guaranteed loan is approved, the SBA reviews the application and all supporting documents. If additional documents are required, the participating bank is notified by letter. The SBA refrains from making a final decision on the loan until all necessary information is received.

36. On or about September 27, 1984, Sossaman received Temp–Way's SBA loan application which had been processed by Continental's SBA loan division. The SBA rejected Temp–Way's application as submitted because Continental had improperly packaged the financing requirements for three Navy contracts into one loan application. Sossaman informed Continental that the loan proposal needed to be divided into three separate loan requests, one loan application for each separate government contract.

37. While the SBA was considering Temp–Way's loan application, Vicari advised Continental's credit department on September 27, 1984 that, subject to the SBA approval of the loan guarantee, Continental would provide Temp–Way with three contract-based financing loans totalling $310,556. Vicari also advised that the loan proceeds would finance material and direct labor costs on the three Navy contracts, the loans would be secured by a ninety-percent SBA guarantee and a first lien and assignment of receivables, all principals would be required to sign Unlimited Surety Agreements, and repayment for the loan would come from progress billings sent directly to Continental over eleven months.

38. On October 31, 1984, Frank Campo, Chief of the Financing Division of the SBA, sent a letter to Continental stating that the SBA would not give its guarantee unless Temp–Way's four major trade creditors executed forbearance letters, prohibiting them from taking any legal action against Temp–Way during the term of the SBA guaranteed loan. In addition, Continental required that Temp–Way's delinquencies with the IRS be addressed. By December 31, 1984, Temp–Way's delinquencies to its trade creditors were resolved to the satisfaction of the SBA.

39. On or about December 5, 1984, following the SBA's initial rejection of Temp–Way's SBA application, Continental, on Temp–Way's behalf, resubmitted to the SBA three separate SBA loan applications for $128,000, $107,000 and $77,000, respectively. In a supplement to the SBA application, Continental expressed its confidence in Temp–Way's new management team.

40. Finally, on December 13, 1984, Campo, of the SBA, executed three SBA Authorizations approving the guarantees for the

three contract loans. The SBA Authorizations were sent to Continental and contained the exclusive terms and conditions that were required to be met prior to the disbursement of any loan proceeds to Temp–Way.

41. The following conditions are of particular relevance:

2. The Authorization [to release the funds] is subject to:

(d) Receipt by lender [Continental] of evidence satisfactory to it in its sole discretion, that there has been no unremedied adverse change since the date of the Application, or since any of the preceding disbursements, in the financial or any other condition of [Temp–Way], which would warrant withholding or not making any such disbursement or any further disbursement. *Furthermore, the first disbursement of the loan was required to be made not later then three months after December 13, 1984 unless such time was extended by the SBA.*

3. Terms of Loan:

(a) Repayment term, interest rate(s) and maturity.

Installments shall be made by applying on the loan Fifty percent (50%) of each payment made by the [Navy] ... and the balance of principal and interest payable twelve months from the date of the Note; ...

4. To further induce Lender to make and SBA to guarantee this Loan, [Continental] and SBA impose the following conditions:

(f) Other Provisions:

(1) Prior to disbursement [Continental] must have evidence that [Temp–Way] is current on all Taxes.... Evidence should include a written statement from IRS no older [sic] one (1) week before disbursement....

(2) Prior to disbursement [Continental] shall have performed and/or shall be in receipt of the following:

(c) [The Navy] ... has been advised in writing by both [Continental and Temp–Way] of the assignment of the Contract, including [Continental's] right to receive all payments from the [Navy]; [Continental] has received a written acknowledgement from the [Navy] to these actions.

(g) Change of Ownership: [Temp–Way] must agree that this loan may be accelerated and payments called for if [it], during the term of the loan, effects a change of ownership or control of the business without prior written approval of [Continental] and SBA.

SBA Authorizations and Loan Agreements (Plaintiffs' Exhibit 62) (emphasis added).

42. The SBA Authorizations also enumerated the SBA's collateral requirements, which were as follows: a third mortgage on the Lindbergh Property, personal guaranties by Denis, Martin and Robert Spellman and their wives, secured by their personal residences, personal guaranties by the Calcaras, secured by their personal property in Philadelphia and New Jersey and a first lien on the accounts receivable of the funded contracts.

43. By December 13, 1984, Temp–Way had been working on the three Navy contracts for approximately six months without any funding from the SBA. While waiting for the SBA loan approval, the Spellmans obtained a $30,000 loan from a new lender, Wyncote Financial Corporation, in order to ease Temp–Way's cash flow crisis. The loan from Wyncote Financial was secured by the Spellmans' personal residences.

44. On January 9, 1985, Continental sent Denis Spellman a copy of each of the three SBA Authorizations.

45. In a letter to Denis Spellman dated January 23, 1985, Abell of Continental reiterated in summary form the terms of the SBA guaranteed loan agreement and the procedure by which Temp–Way would actually receive the funds. The SBA's loan terms required that funds for the projects be disbursed only as the invoices for material and direct labor were presented. Additionally, remittances for the government contracts would be mailed directly to Continental, at which time Continental would use half of the remittance to reduce the

outstanding loan balance and remit the other half to Temp–Way.

46. Abell's January 23, 1985 letter also informed Denis Spellman that in order for Continental to disburse the SBA funds, Temp–Way was required to provide Continental with a letter from the IRS stating that Temp–Way was current on its repayment plan, copies of all executed agreements with Temp–Way's creditors, and a copy of the stock agreement between the Calcaras and the Spellmans. The foregoing were *not* newly imposed conditions. Continental's demand for a letter from the IRS was required by SBA Authorizations' § 4(f)(1), which specifically stated that Continental must have evidence that Temp–Way is current on all taxes. *See supra* ¶ 41. Continental's demand for copies of executed agreements with Temp–Way's creditors was previously requested by Continental in a letter dated October 3, 1984.[3] Continental's demand for an executed stock purchase agreement was entirely consistent with SBA Authorizations' ¶ 4(g), which provided that failure to inform the SBA of a material adverse change in Temp–Way' financial condition, including any change in the ownership, could result in the loan being accelerated. *See supra* ¶ 41. Moreover, Continental's demand for an executed stock purchase agreement was justified and consistent with the Spellmans' representation on the SBA loan application and Sossaman's and Abell's belief that the Spellmans were part owners of Temp–Way.

47. On March 14, 1985, Abell and Donahue requested a two month extension on the first disbursement date of Temp–Way's SBA guaranteed loan. The extension request was essential in light of SBA's stated policy that funds for approved loans be disbursed within three months of the SBA's approval date and three months had, in fact, passed since the SBA approved Temp–Way's loan application on December 13, 1984. The SBA approved the March 14, 1985 extension request.

48. In January, 1985, Continental advised Denis Spellman of the SBA's approval. It was not until April 1, 1985, however, that Denis Spellman received a letter directly from the SBA informing him that Temp–Way's loan application had been approved. Denis Spellman contacted Abell to confirm when the funds would be disbursed and was told that the funds could not be disbursed unless the commercial mortgage was current.

49. On May 9, 1985, Abell and Donahue requested another two month extension from the SBA for the first disbursement date on the loans.

50. On June 3, 1985, the Spellmans executed the stock purchase agreement.

51. Abell wrote to Temp–Way on June 26, 1985. The letter stated that in order for Continental to release the SBA guaranteed loans, Temp–Way had to provide the following: (1) a letter from the IRS, dated no earlier than one week prior to and no later than the date of the loan disbursement, confirming that Temp–Way was current on its repayment plan; (2) confirmation that Temp–Way's commercial mortgage was current; and (3) confirmation that Temp–Way's trade creditor agreements were current.

52. Denis Spellman was aware of the foregoing requirements because they were previously identified in the SBA's Authorizations which had been forwarded to Temp–Way in January, 1985 and again set forth in Abell's letter to Denis Spellman dated January 23, 1985.

53. Continental properly demanded a letter from the IRS pursuant to the SBA

---

**3.** In fact, Temp–Way did not follow up on Continental's demand for creditor agreements. As a result, on October 31, 1984, the SBA wrote to Mr. Donahue of Continental's SBA department and stated the following:

We have completed our review of your request [for a SBA guaranty] and find that we will be unable to favorably consider giving

our guaranty unless the four (4) major creditors will provide written evidence that they will refrain from taking any legal action against [Temp–Way] during the term of the [SBA] loan.

Letter from SBA to Continental dated October 31, 1984 (Plaintiffs' Exhibit 54).

Authorizations §§ 2(d) and 4(f)(1). *See supra* ¶ 41.[4]

54. Similarly, Continental's demand for a confirmation from Temp–Way that it was current with its trade creditors and mortgage was made properly pursuant to the SBA Authorizations § 2(d). *See supra* ¶ 41.

55. Temp–Way's financial statements for the year ending December 31, 1984 showed that Temp–Way had sustained a $254,000 net operating loss as compared to a $21,000 profit for the year ending December 31, 1983. As a result, Continental's credit department, for internal purposes only, classified Temp–Way's loan as a potential problem.

56. Continental never specifically advised the SBA that Temp–Way's loan had been so classified because Continental did not consider that classification evidence of a material adverse change in Temp–Way's financial condition. The loss was brought to the SBA's attention by Continental when, on or about June 20, 1985, Abell forwarded a copy of Temp–Way's December 31, 1984 financial statement to the SBA. After receiving the financial statements, the SBA advised Abell that there was no problem with the continuing guarantee on the loans.

57. In the meantime, Denis Spellman kept Abell apprised of the progress on the Navy contracts, including the amounts billed and received and the balances remaining.

58. On July 8, 1985, Continental requested from the SBA a third two month extension for the first disbursement of SBA funds. The request was made because Continental was waiting for executed Notice of Assignment forms from the Navy, acknowledging Temp–Way's assignment to Continental of the accounts receivables for each of the three government contracts. Temp–Way's assignment to Continental of the government contract proceeds was required by the SBA Authorizations §§ 3(a) and 4(f)(2)(c). *See supra* ¶ 41.

59. Vicari contacted Denis Spellman in early July, 1985, in his capacity as the new president of Temp–Way, and Dolores Calcara, in her capacity as the former president of Temp–Way, and requested that they execute a $350,000 collateral mortgage on the Lindbergh Property. The $350,000 mortgage consolidated two outstanding loans Temp–Way had with Continental. Of the $350,000 mortgage, $250,000 represented loans made by Continental to Temp–Way prior to April 1, 1984, the date the Spellmans began their employment with Temp–Way, and $100,000 represented the $100,000 line of credit previously advanced to Temp–Way on May 8, 1984 and secured by the Calcaras' Lagoon Drive, residential property in Margate, New Jersey. Prior to executing this mortgage, Denis Spellman had not served as a guarantor of any of the $350,000 indebtedness.

*Temp–Way Receives the SBA Contract Based Financing*

60. On July 24, 1985, approximately one year after the Spellmans first submitted the SBA loan application to Continental, Temp–Way received the SBA guaranteed funds. Although Temp–Way had applied for a $312,000 loan, Continental deposited only $202,096 into Temp–Way's account at Continental.

61. The SBA guarantees funds only to the extent that *each* contract has sufficient balances remaining to be paid and available to liquidate its loan. Because Temp–Way had completed and received substantial payment on each of the three Navy contracts, it did not have sufficient balances remaining to be paid by the Navy to support the $312,000 SBA guaranteed loan requested initially.[5]

---

4. The SBA Authorizations §§ 2(d) and 4(f)(1) required that Continental have, prior to disbursing funds, satisfactory evidence, subject to Continental's sole discretion, showing that since applying for the SBA loan, Temp–Way had not experienced any unremedied adverse change. In addition, § 4(f)(1) required that the statement from the IRS be written and dated no

earlier than one week before the loan was disbursed. *See* supra ¶ 51.

5. While the original loan agreement with the SBA was for $312,000, Continental's disbursement of $202,096 was entirely consistent with the terms of the SBA contract described in the SBA Authorization. The SBA loan was a self-

*Sale of Temp–Way's Lindbergh Property*

62. By September, 1985, the company's strained working capital position prompted the Spellmans to consider seriously selling the Lindbergh Property.[6] Temp–Way was two months delinquent on its mortgage payments. On September 9, 1985, Temp–Way received another mortgage delinquency letter, which, for the first time was signed by Vicari. Previously, Temp–Way received form letters from Continental's credit manager and not Vicari directly. Before Vicari wrote to Temp–Way, Abell informed Continental's Commercial Credit Department by internal memorandum dated September 6, 1985, that "Mr. Vicari stressed the importance of Denis trying to sell the property now rather than having the bank force the sale."

63. During the month of September, 1985, Continental charged Temp–Way's account for $2,351.57 for interest due for the months of July and August.

64. On January 13, 1986, Temp–Way sold the Lindbergh Property to Herman Lefco for $450,000. Not appearing on the settlement sheet, but included in the $450,-000 sale price, was the forgiveness of Temp–Way's $75,000 debt to Herman Lefco, which the Spellmans had guaranteed. Proceeds from the sale of the Lindbergh Property were used to satisfy $429,814 of Temp–Way's debt, including but not limited to, the satisfaction of Temp–Way's mortgage to Continental, city and state delinquent tax liens and Temp–Way's obligation to Wyncote Financial. Temp–Way's counsel, Harry Blackburn, received a fee of $7,300 for representing Temp–Way in regard to the same sale. As a result of the

sale, Temp–Way realized a net increase in cash flow.

65. From early 1984 until January, 1986, when the Lindbergh Property was sold, Temp–Way had failed to make a single principal payment on its debt. Although Continental favored the idea of selling the Lindbergh Property and apprised Temp–Way of its legal right to foreclose under the terms of the mortgage if Temp–Way's delinquencies to Continental were not resolved, it did not force Temp–Way to sell the Lindbergh Property.

66. Notwithstanding Denis Spellman's preference not to sell the Lindbergh Property, its sale accomplished several of Denis Spellman's proclaimed financial priorities for Temp–Way, including the cessation of interest and penalties on delinquent tax obligations, reduction in debt to Continental, and payoff of the loan to Wyncote.

67. In late October, 1985, Temp–Way submitted a second application to Continental for SBA financing. The application requested a $100,000 term loan for Temp–Way's working capital. As with the first SBA guaranteed loan, Continental did not make any commitment to provide financing. In fact, Continental refused to begin processing Temp–Way's request for a second SBA guaranteed loan until it received Temp–Way's 1985 year-end financial statement.

68. After the sale of the Lindbergh Property in January, 1986, the Spellmans and the Spellman wives executed a revised SBA loan application. The revised application, executed January 27, 1986, requested $175,000 for working capital instead of $100,000.

---

liquidating loan which required Temp–Way to apply fifty percent of each progress payment to reduce the outstanding SBA loan balance. To illustrate, in order to comply with the self-liquidating feature of the SBA Authorizations, for every $100 loaned to Temp–Way, *each* Navy contract had to have $200 of collateral in the form of payments receivable.

On July 25, 1985, the three Navy contracts which served as collateral for the SBA loans had balances of $462,731, $53,747, and $94,445, respectively. Therefore, Continental was permit-

ted to lend the full $128,000 on the first contract; however, it was only permitted to lend $26,873.50 on the second contract (50% of $53,-747) and $47,222.50 on the third contract (50% of $94,445).

6. As early as August 28, 1985, Harry Blackburn, counsel for Temp–Way, was authorized to sell the Building for a commission. Blackburn and another person offered to buy the Building for $475,000 if they were able to obtain one hundred-percent financing.

*Temp–Way's Account Transferred to the Continental's Loan Work–Out Department*

69. Continental classified Temp–Way's account as substandard, which meant the account had a weakness in developing operations, financial strength, paying capacity or collateral which could jeopardize the orderly repayment of the debt if the deficiency went uncorrected.

70. In February, 1986, Temp–Way's classified account was removed from Vicari's control and given to defendant Frank Leis, a loan workout officer in Continental's work-out department. At that time, Leis had been employed by Continental for eleven years. At all times relevant to the instant litigation, Leis was employed in the work-out and loan recovery department. The work-out department handled "classified loans" which were loans that Continental considered to be substandard relative to normal lending practices. Leis' primary responsibility was to either get the accounts to perform or to liquidate the account.

71. Throughout February and March, 1986, Denis Spellman advised the bank as to projected deposits into Temp–Way's account and Continental would approve overdrafts for corresponding amounts. In or about March, 1986, Abell informed Denis Spellman that some of Temp–Way's receipts had not come in quickly enough to cover all the checks written and, consequently, Temp–Way's account overdrafted. The overdrafts occurred because, contrary to Denis Spellman's assurances, Temp–Way failed to make sufficient deposits to cover overdrafts.

72. On or about March 27, 1986, Vicari introduced the Spellmans to Leis. On or about April 8, 1986, Denis Spellman again met with Leis to discuss the status of the second SBA loan application.

*Continental Provides Additional Funding and The Spellmans and Temp–Way Sign Various Agreements*

73. On April 15, 1986, following the meeting between Leis and Denis Spellman, Denis Spellman executed, on Temp–Way's behalf, a $125,000 non-discount note from Continental. As security for the note, Temp–Way pledged its inventory, and the Spellmans and their wives pledged their personal property and signed Unlimited Surety Agreements.

74. The Spellmans executed a Security Agreement on behalf of Temp–Way and for Continental's benefit as the secured party. Paragraph ¶ 1 of the Security Agreement provided that "Bank may lend to Borrower from time to time, as Borrower may request and at Bank's sole discretion." Security Agreement (Plaintiffs' Exhibit 199).

75. Denis and Martin Spellman executed, on Temp–Way's behalf, an Inventory Security Agreement between Temp–Way and Continental. The Inventory Security Agreement makes no reference to the possibility of any additional financing.

76. The Security Agreement and Inventory Security Agreement each provided that such agreement was "the entire agreement," and that "[n]o waiver by the Bank shall be effective unless in writing signed by an executive officer of the rank of Vice President or higher." Security Agreement and Inventory Security Agreement (Plaintiffs' Exhibit 199). The Inventory Security Agreement provides further that "[t]here [were] no oral agreement not expressed herein." *Id.*

77. The two identical Unlimited Surety Agreements, executed by Denis and Mary Ellen Spellman and Martin and Leslie Spellman on April 15, 1986, make no reference to the possibility of Temp–Way or the Spellmans receiving additional financing. The Unlimited Surety Agreement provides that "[n]o executory agreement unless in writing and signed by Bank and no course of dealing between the [Spellmans] and Bank shall be effective to change or modify or discharge in whole or in part this Agreement." Unlimited Surety Agreements (Plaintiffs' Exhibit 199).

78. On or about May 14, 1986, R.M. Shoemaker Co. awarded Temp–Way the mechanical portion of the United Parcel Service project for a total contract price of $398,000. Pursuant to the award of this contract, Temp–Way submitted a loan pro-

posal to Leis for ten percent of the contract amount. The proposal contemplated the use of the contracts' accounts receivables as the collateral for the loan. The proposal was rejected by Leis on the basis that Temp–Way lacked liquid collateral such as real estate, stocks, or bonds to support the contract financing. Furthermore, the work-out department was unable to use accounts receivable as collateral.

79. On May 14, 1986, Temp–Way's outstanding mechanical contracts to be performed amounted to $1,210,811.

80. In or about June, 1986, the Local 19 Sheet Metal Workers, Local 690 Plumbers, and Local 420 Steamfitters Union requested that Temp–Way put up a bond to cover health and welfare benefits due the union. Pursuant to the Union's request, Denis Spellman formally requested that Continental provide him with three stand-by letters of credit in the amount of $15,000 each in lieu of a bond. Continental never acted on Spellman's request.

81. By mid-July, 1986, Temp–Way's overdrafts were close to $250,000. On July 15, 1986, Denis Spellman, on behalf of Temp–Way, executed a $250,000 non-discount note to secure the $250,000 overdrafts. The newly executed note merely converted the overdrafts into an official loan and supplied no new capital to the company.

82. With no apparent prospect which would enable Temp–Way to repay the mounting debt to Continental with internal funds, Denis Spellman assembled a loan proposal to sell to outside investors.

83. Throughout July and August of 1986, Temp–Way bid on and was awarded new contracts. Temp–Way was the low bidder on the mechanical portion of a project for Boeing–Vertol. The mechanical portion of that project was projected to last over one year and had a contract price of approximately three million dollars. The Spellmans did not pursue this contract any further because Continental would not guarantee additional financing to support the project. By this time, Temp–Way's debt to Continental had grown to $651,848.66.

84. In early September, 1986, Denis Spellman drafted a $1,000,000 loan proposal which suggested that Continental consolidate all of Temp–Way's debt and convert it into a long-term loan and provide $577,084 in new funding. Denis and Martin Spellman presented this proposal to Leis on or about September 3, 1986. Leis told the Spellmans that the proposal was workable if Temp–Way could get a guarantor for the loan for one year. Leis, however, was a loan work-out officer at Continental and, as such, had no independent lending authority. Leis advised Denis Spellman that he did not have the authority to approve a million dollar loan and that such a request would have to be reviewed by Leis's superiors on the Loan Committee at Continental.

85. Herman Lefco agreed to guarantee the proposed million dollar loan for one year only. On September 11, 1986, however, Leis told Denis Spellman that in order for the proposal to be considered, the loan would have to be guaranteed for five years. Lefco was only willing to guarantee the loan for one year.

86. October 14, 1986, Denis Spellman, on behalf of Temp–Way, executed a term note in the amount of $635,393 which consolidated all of Temp–Way's previous borrowing, including some overdrafts. The note was approved by Leis and defendant Francis Conway and provided no new capital to Temp–Way. Francis Conway, was employed by Continental as an executive vice president in charge of credit policy and credit administration which includes loan review, loan workout, and credit department policy matters.

87. In late October, 1986, Leis advised Denis Spellman to seek outside financing because Continental would not provide additional financing. Moreover, Leis advised Denis Spellman that in Continental's view, Temp–Way's accounts receivables were worthless collateral.

88. On October 21, 1986, Wyncote Financial agreed to provide Temp–Way with financing of $250,000, using Temp–Way's accounts receivables as collateral. Continental agreed to subordinate their position

on Temp–Way's accounts receivable in favor of Wyncote Financial because it believed the accounts receivable were worthless.

89. Beginning in December, 1986, and continuing through February, 1987, Temp–Way's accounts were overdrafted. Denis Spellman had daily conversations with Leis with regard to the overdrafts.

90. On January 22, 1987, Denis Spellman transferred the remaining balance of $5,600 from Temp–Way's operating account into Temp–Way's payroll account, which effectively closed Temp–Way's operating account.

91. In February, 1987, at the direction of Continental, Zinberg & Co. ("Zinberg"), a certified public accounting and management consulting firm, conducted an investigative audit of Temp–Way. The purpose of the audit was to determine the cause of the ongoing cash flow problems. In connection with the investigation, Zinberg prepared a report of its findings and supplied it to Leis.

92. Zinberg's report concluded, *inter alia*, that the Spellmans' ability to manage the company was "severely impacted" by the inadequate working capital base that existed from the time they took over the company. The report also stated:

> The company is engaged in an industry which is extremely labor-intensive. In many instances, management has determined upon the completion of a given contract that the Direct Labor hours exceeded original estimates. Accordingly, it is most important that the Company estimate Direct Labor hours on each contract as accurately as possible and institute ongoing procedures to ensure that these estimates are not exceeded.
>
> Management has informed us that it is well aware of the need for the injection into the Company of a substantial amount of permanent capital and towards that end, it is exploring various possible sources in its industry.

Zinberg's Management Report dated February 4, 1987 (Defendants' Exhibit 43).

93. Following Leis's suggestion to pursue outside financing, the Spellmans proposed Temp–Way's leverage buy-out of Oreland Sheet Metal ("Oreland"). Oreland was in the business of fabricating and installing sheet metal and air conditioning systems. In 1987, Carl Schauber, Oreland's owner, decided to sell the company. Denis Spellman discussed with Leis the possibility of Temp–Way's leveraged buy-out of Oreland's assets. Leis never promised Temp–Way, however, that Continental would fund the leverage buy-out.

94. Oreland's building was a leasehold improvement on property owned by Jack Rittenhouse, a large depositor at Continental and an individual of significant net worth. Denis and Martin Spellman submitted to Rittenhouse a written proposal for the leveraged buy-out, which included a loan of $1.5 million dollars to purchase Oreland. Rittenhouse rejected the proposal.

95. On or about March 11, 1987, Denis Spellman submitted another proposal to Rittenhouse. This proposal requested that Rittenhouse subordinate his secured position on the property so that Oreland could be leveraged. The Spellmans also continued their negotiations with Schauber regarding the purchase of Oreland. Temp–Way never formally executed an agreement to purchase Oreland and, as such, the transaction was never consummated.

96. On March 20, 1987, Denis Spellman submitted a loan proposal to Leis which contemplated a $2 million loan to purchase Oreland's assets. All of Oreland's machinery and equipment would be pledged as collateral. Plaintiffs admit that Leis told Denis Spellman that he would give the proposal to Conway. (2/25/91 N.T. 54). On March 26, 1987, Denis Spellman received a letter from Leis rejecting the proposal and notifying Temp–Way that Continental would not honor any more checks on the account unless the accounts reflected positive balances.

97. On April 1, 1987, Temp–Way formally filed for Bankruptcy under Chapter 11 of the United States Bankruptcy Code.

## CONCLUSIONS OF LAW

1. The amended complaint sets forth the following six claims asserted by Temp–Way and the Spellmans individually: breach of fiduciary duty (Count I); breach of financing agreement (Count II); business coercion and economic duress (Count III); fraud (Count IV); intentional interference with contractual relations (Count V); and negligent misrepresentation (Count VII). Temp–Way alone seeks determination of secured status and existence of debt/setoff (Count VI).

2. Continental included in its answer a three Count counterclaim and set-off naming Temp–Way, Denis Spellman, Martin Spellman and the Spellman wives as defendants. Count I alleges that Temp–Way and the Spellmans, upon the belief that Continental would not honor overdrafts on Temp–Way's operating account, intentionally wrote checks for Temp–Way's operating expenses on Temp–Way's payroll account in an attempt to fraudulently induce Continental to honor overdrafted checks. Count II of Continental's counterclaim seeks judgment against Temp–Way for amounts due and owing under various loan agreements. Count III of Continental's counterclaim alleges that the Spellmans and the Spellman wives are in default and personally liable under the Unlimited Surety Agreement and seeks, by way of set-off or otherwise, recovery of the sum of $986,-253.10, plus interest and reasonable attorney's fees.[7] *See infra* note 14.

3. The Spellman wives abandoned at trial their counterclaim against Continental and the individual defendants which was included in their reply to Continental's counterclaim.

### Spellmans' Standing

4. The Spellmans maintain that they have standing to recover damages for six of the seven claims asserted by Temp–Way.[8] It is well established that a stock-

---

7. The agreements executed by Temp–Way and the Spellmans include the right to claim attorney's fees as follows:

The Security Agreement between Temp–Way and Continental provides that, "[b]orrower shall bear at its own expense the full cost and expense (including attorney's fees) of collection and enforcement of Borrower's accounts receivable whether such costs are incurred by Borrower or by Bank." Security Agreement ¶ 7 (Plaintiffs' Exhibit 199).

The Inventory Agreement between Temp–Way and Continental provides that, "[b]orrower irrevocably empowers any attorney ... to appear for Borrower ... to enforce the obligations hereunder and/or for costs, expenses and/or reasonable counsel fees to be paid by Borrower ..." Inventory Agreement ¶ 13 (Plaintiffs' Exhibit 199).

The Unlimited Surety Agreements between Denis and Mary Ellen Spellman and Continental and Martin and Leslie Spellman and Continental provides, "[u]ndersigned and each of them hereby empower any attorney ... to appear for Undersigned and each of them in any or all actions which may be brought to enforce the obligations hereunder and/or cost, expenses, and/or reasonable counsel fees agreed to be paid by Undersigned...." Unlimited Surety Agreements (Plaintiffs' Exhibit 199).

The Commercial Term Note executed by Temp–Way provides, "[t]HE UNDERSIGNED HEREBY AUTHORIZE ... ANY ATTORNEY ... TO APPEAR FOR THE UNDERSIGNED ... AND ENTER JUDGMENT AGAINST THE UNDERSIGNED FOR THE PRINCIPAL SUM, PLUS INTEREST ... WITH COSTS OF SUIT AND ATTORNEY'S COMMISSIONS OF FIFTEEN PERCENTUM (15%) ..." Commercial Term Note (Plaintiffs' Exhibit 230) (emphasis in the original).

8. Only Temp–Way asserts a claim under Count VI for the Determination of Secured Status and Existence of Debt–Set–Off. In addition to the claims brought by Temp–Way, Denis and Martin Spellman assert claims on their own behalf, separate and apart from their capacity as employees and equity owners of Temp–Way.

The court notes that no Temp–Way stock was ever released to the Spellmans from escrow because the Spellmans failed to pay for the stock. The court finds that the Spellmans intended their participation in the company to be that of a stockholder and not as a creditor, since, from the outset, they held themselves out as owners and the stock purchase agreement contemplated a stockholder relationship, not a creditor relationship.

The parties are reminded that the essential difference between a creditor and a stockholder is that a stockholder invests in the corporation's venture and takes the risk of loss in order to share in the profits, while a creditor does not intend to take such risk but merely lends his capital to others and seeks a definite obligation payable in any event. *See generally Scriptomatic, Inc. v. United States*, 397 F.Supp. 753 (E.D.Pa. 1975); *Fischer v. U.S.*, 441 F.Supp. 32, 36–37 (E.D.Pa.1977); *Utility Trailer Mfg. Co. v. United States*, 212 F.Supp. 773 (S.D.Cal.1962); *Security Finance & Loan Co. v. Koehler*, 210 F.Supp. 603 (D.C.Kan.1962).

holder, director, officer or employee of a corporation has no personal or individual right of action against third persons for damages that result indirectly to the individual because of an injury to the corporation. *Pitchford v. PEPI, Inc.*, 531 F.2d 92, 97 (3d Cir.1975), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir.1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1190, 28 L.Ed.2d 323 (1971); *Nagle v. Commercial Credit Business Loans Inc.*, 102 F.R.D. 27, 29 (E.D.Pa. 1983). Similarly, while the Third Circuit has not squarely held as such, it is generally accepted that guarantors of a corporation's debt, even if those guarantors are also stockholders, do not have standing to bring an action if the only harm suffered is derivative of the harm the corporation suffered. *See MidState Fertilizer v. Exchange Nat. Bank*, 877 F.2d 1333, 1335–37 (7th Cir.1989); *Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635, 641 (9th Cir.1988); *Sherman v. British Leyland Motors, Ltd.*, 601 F.2d 429, 439–440 (9th Cir.1979); *Walstad v. Norwest Bank*, 240 Mont. 322, 783 P.2d 1325, 1328 (1989); *Mullins v. First National Exchange Bank*, 275 F.Supp. 712, 721–22 (W.Va.1967) (citing *Nilliken v. McGarrah*, 159 App.Div. 725, 144 N.Y.S. 964 (1913)).

5. There are several exceptions to the above rule, however. One such exception exists where there is a special duty, such as a contractual duty, between the wrongdoer and the stockholders. This special duty exception applies most often where there is a fiduciary relationship between the wrongdoer and the stockholder. *Cole v. Ford Motor Co.*, 566 F.Supp. 558, 568–69 (W.D.Pa.1983). Another exception exists where the stockholders suffer an injury separate and distinct from that suffered by the corporation as a result of the wrongdoer's actions. *Id.* Stockholders, similarly, have standing to seek damages in their own right for misrepresentations made to them before they were shareholders for the purpose of inducing their investment. *See generally Davis v. U.S. Gypsum*, 451 F.2d 659, 662 (3d Cir.1971); *White v. First National Bank*, 252 Pa.

205, 97 A. 403 (1916); *Howell v. Fisher*, 49 N.C.App. 488, 272 S.E.2d 19, 26 (1980), *cert. denied* 302 N.C. 218, 277 S.E.2d 69 (1981); 12b Fletcher, Cyclopedia Corporations, § 5921 (1984).

6. The Spellmans have standing as individuals to assert claims based on breach of a fiduciary duty, breach of oral financing agreements, fraud and negligent misrepresentation insofar as they seek compensation for damages sustained prior to the time they were stockholders, officers or employees of Temp–Way.

7. The Spellmans do not have standing, however, to assert claims for economic duress, business coercion, and intentional interference with contractual relations allegedly suffered by Temp–Way. These allegations stem from transactions arising after the Spellmans became Temp–Way employees on April 1, 1984. Consequently, these claims relate to transactions between Continental and Temp–Way, and not to the Spellmans as individuals. Likewise, the fact that the individual plaintiffs were guarantors on the note executed by Temp–Way does not create a personal right of action independent of the harm suffered by the corporation.

8. In accordance with the foregoing, the Spellmans have standing to assert Counts I (breach of fiduciary duty), Count II (breach of financing agreement), Count IV (fraud in the inducement) and Count VII (negligent misrepresentation) to the extent such conduct occurred before April 1, 1984. The Spellmans do not have standing, however, with respect to Count III (business coercion and economic duress) and Count V (intentional interference with contractual relations).

I. Plaintiffs' Seven Count Amended Complaint and Set–Off Breach of Fiduciary Duty (Count I)

9. Count I of the amended complaint states a claim by all plaintiffs based on an alleged breach of fiduciary duty. A person in a fiduciary relation to another is under a duty to act for the benefit of that other person. Fiduciary or confidential re-

lationships arise when one party places confidence in another with resulting superiority and influence on the other. *Yohe v. Yohe,* 466 Pa. 405, 353 A.2d 417 (1976). *See generally Maritrans G.P. Inc., et al. v. Pepper, Hamilton & Scheetz, et al,* —— Pa. ——, 602 A.2d 1277 (Pa.1992). In order to establish the existence of a fiduciary relationship, Temp–Way and the Spellmans must each demonstrate that there was an overmastering influence on one side, and weakness, dependence or trust on the other side at a relevant time. *In re Estate of Evasew,* 526 Pa. 98, 584 A.2d 910, 912–13 (1990); *In re Estate of McClatchy,* 433 Pa. 232, 249 A.2d 320, 322 (1969). In asserting their claim for breach of a fiduciary duty, plaintiffs must prove that the association of the parties:

> [I]s one wherein a party is bound to act for the benefit of another, and can take no advantage to himself. [A fiduciary relationship] appears when the circumstances make it certain that the parties do not deal on equal terms, but on one side there is an overmastering influence and, on the other, weakness, dependence, or trust, justifiably reposed....

*Leedom v. Palmer,* 274 Pa. 22, 117 A. 410, 411 (1922).

10. Pennsylvania law follows the well recognized principle that a lender is not a fiduciary of the borrower. *Grace v. Moll,* 285 Pa. 353, 132 A. 171, 171–72 (1926); *Federal Land Bank of Baltimore v. Fetner,* 269 Pa.Super. 455, 410 A.2d 344, 348 (1979), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980); *Buczek v. First National Bank,* 366 Pa.Super. 551, 531 A.2d 1122, 1124 (1987). This principle stems from the presumption that the relationship between lenders and borrowers is conducted at arms-length and the parties are each acting in their own interest. *Frowen v. Blank,* 493 Pa. 137, 425 A.2d 412, 416 (1981); *In re W.T. Grant Co.,* 699 F.2d 599, 609–610 (2d Cir.1983), *cert. denied, sub nom., Cosoff v. Rodman,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

11. Although a lender does not ordinarily owe a fiduciary duty to a borrower, a fiduciary relationship may arise if the lender gains substantial control over the borrower's business affairs. *Blue Line Coal Co.,* 683 F.Supp. 493, 496 (E.D.Pa.1988) (citing *NCNB Nat. Bank v. Tiller,* 814 F.2d 931, 936 (4th Cir.1987)). Control over the borrower is demonstrated when there is evidence that the lender was involved in the actual day-to-day management and operations of the borrower or that the lender had the ability to compel the borrower to engage in unusual transactions. *Blue Line Coal Co., Inc. v. Equibank,* 683 F.Supp. at 496 (citing *Stainton v. Tarantino,* 637 F.Supp. 1051, 1066 (E.D.Pa.1986)). The mere monitoring of the borrower's operations and the proffering of management advice by lenders, without more, does not constitute control. *In re W.T. Grant, Co.,* 699 F.2d at 610–11; *Krivo Indus. Supply Co. v. Nat. Distillers & Chemical Corp.,* 483 F.2d 1098, 1105 (5th Cir.1973). Moreover, action taken by the creditor to minimize risk does not constitute total and absolute control. *James E. McFadden, Inc. v. Baltimore Contractors, Inc.,* 609 F.Supp. 1102, 1105 (E.D.Pa. 1985).

12. Plaintiffs contend that Continental and Vicari, a senior vice president at Continental and its employee for twenty-nine years, had a close business relationship with the Calcaras, the former principals of Temp–Way, prior to the time the Spellmans became Temp–Way employees. According to plaintiffs, Vicari inspired their trust and confidence and then used his position as a fiduciary to assert undue influence. Specifically, plaintiffs assert that Vicari encouraged the Spellmans to purchase Temp–Way from the Calcaras, Vicari gave advice to the Spellmans regarding the expansion of Temp–Way's sales and Vicari induced the Spellmans to pay off old corporate debt held by Continental and to pay off IRS claims which had been incurred by Temp–Way's former management. Plaintiffs also contend that Vicari advised the Spellmans to seek SBA contract financing and encouraged them to undertake government contracts and other commercial contracts prior to the disbursement of the SBA–guaranteed loan proceeds. In addi-

tion, plaintiffs further allege that Vicari failed to honor promises to provide Temp–Way and the Spellmans with much needed working capital and financing and then induced Temp–Way to sell the Lindbergh Property when the effects of undercapitalization became a financial emergency. Count I also alleges that defendants encouraged the Spellmans to overdraft Temp–Way's bank accounts.

13. Temp–Way alleges that a fiduciary relationship arose because Continental effectively controlled Temp–Way's operations. In support of this claim, Temp–Way maintains that Continental unilaterally charged Temp–Way's checking account for interest charges on debt to Continental and selectively allowed only certain checks to clear Temp–Way's checking account.

14. The evidence is insufficient to sustain plaintiffs' burden that Continental owed a fiduciary duty to Temp–Way arising out of the lender/borrower relationship. The evidence also fails to demonstrate that Continental exerted substantial control over the business operations of Temp–Way sufficient to establish that a fiduciary duty was owed to Temp–Way. At all times, the relationship between Continental and the plaintiffs was conducted at arms-length, with each side acting in their own best interest. Temp–Way failed to demonstrate that it justifiably depended on Continental for financial advice, direction and/or corporate strategy. Further, the record fails to establish that Continental exerted, to the degree necessary to sustain Temp–Way's claim, an overmastering influence and domination over Temp–Way so as to cause Temp–Way to repose in Continental its confidence and trust.

15. Continental's willingness or unwillingness to provide financial assistance, to honor overdraft checks and later to convert those overdrafted amounts to loans and to issue letters of credit, constituted conduct that, under the circumstances, was normal and necessary to an arms-length lend-er/borrower relationship. Continental's actions vis-a-vis Temp–Way represent conduct normally made in the course of a bank's relationship with its borrower and are not tantamount to an exercise of excessive control over Temp–Way's operations or business affairs sufficient to give rise to a fiduciary relationship.

■ 16. The Spellmans, similarly, fail to demonstrate that it justifiably depended on Continental for financial advice and direction. From the outset, the Spellmans sought out and considered advice received from independent accountants and attorneys. Accordingly, there is insufficient evidence to establish that Continental exerted, to the degree necessary to sustain the Spellmans' claim, an overmastering influence and domination over the Spellmans so as to cause them to repose in Continental its confidence and trust.

*Breach of Good Faith and Breach of Oral Financing Agreement (Count II)*

A. *Breach of Good Faith*

17. Plaintiffs allege that although Continental did not breach an explicit term of the written loan document, defendants breached their financing agreement by not dealing with plaintiffs in good faith and by failing to comply with their oral promises for financing.[9]

■ 18. While Pennsylvania recognizes an implied contractual duty of good faith in limited situations, it has refused to do so in the lender/borrower relationship. *Creeger Brick and Building Supply, Inc. v. Mid–State Bank and Trust Company,* 385 Pa.Super. 30, 560 A.2d 151, 154 (1989).

■ 19. Pennsylvania courts have also refused to impose a duty of good faith upon creditors which would modify or defeat their legal rights. *See Creeger Brick,* 560 A.2d at 154 (citing *Heights v. Citizen National Bank,* 463 Pa. 48, 342 A.2d 738

---

9. "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205, Comment a, p. 100 (1981). A similar requirement is imposed upon contracts within the Uniform Commercial Code by 13 Pa.Const.Stat.Ann. § 1203 (1984).

(1975)). As stated by the Superior Court of Pennsylvania:

> The duty of good faith imposed upon contracting parties does not compel a lender to surrender rights which it has been given by statute or by the terms of its contract. Similarly, it cannot be said that a lender has violated a duty of good faith merely because it has negotiated terms of a loan which are favorable to itself. As such, a lender is generally not liable for harm caused to a borrower by refusing to advance additional funds, release collateral, or assist in obtaining additional loans from third persons. A lending institution also is not required to delay attempts to recover from a guarantor after the principal debtor has defaulted.

*Id.*

 20. It is also well settled in Pennsylvania that no obligation of "good faith" applies to decisions either to terminate or not renew an agreement when the agreement reserves to a party the express right to make that decision. *Amoco Oil Co. v. Burns,* 496 Pa. 336, 437 A.2d 381, 383–83 (1981); *Witmer v. Exxon Corp.,* 495 Pa. 540, 434 A.2d 1222, 1227 (1981).

 21. Moreover, any effort by plaintiffs to allege a tort claim for the alleged breach of good faith is, similarly, without merit. In *Creeger,* the Pennsylvania Superior Court held that a borrower does not have a legally cognizable tort action against a lending institution for failure to deal with its borrower in good faith. *Creeger,* 560 A.2d at 154. The *Creeger* court reasoned that where a duty of good faith arises it arises under the law of contracts, and there is no need to create a separate tort for breach of a duty of good faith. *Id.* at 153, 155 (citing *AM/PM Franchise Association v. Atlantic Richfield Co.,* 373 Pa.Super. 572, 542 A.2d 90, 94 (1988)).

### B. Breach of Oral Agreement to Provide Financing

 22. Plaintiffs allege that defendants failed to comply with their oral promises to provide financing. Generally, an oral contract must be established by clear and precise evidence. *Orchard v. Covelli,* 590 F.Supp. 1548, 1556 (W.D.Pa. 1984), *affirmed,* 802 F.2d 448 (3d Cir.1986). An agreement to lend money to be secured by a mortgage on real property, however, is subject to the Pennsylvania statute of frauds, and, thus, must be in writing. *Linsker v. Savings of America,* 710 F.Supp. 598, 600 (E.D.Pa.1989). Furthermore, if writings must be linked or supplemented by oral testimony in order to make out a contract, the contract is considered an oral one for Statute of Frauds purposes. *Green v. Interstate United Management Services Corp.,* 748 F.2d 827, 830 (3d Cir. 1984); *See e.g., United States v. 29.16 Acres,* 496 F.Supp. 924, 928 (E.D.Pa.1980); *Haines v. Minnock Constr. Co.,* 289 Pa.Super. 209, 433 A.2d 30, 33 (1981).

 23. Plaintiffs concede that the financing commitments made by Continental for which Temp–Way alleges a breach were orally made commitments that were to be secured by real estate. Thus, the Statute of Fraud bars plaintiffs' claim that defendants breached an oral financing agreement.

 24. Notwithstanding, and apart from the Statute of Frauds bar, plaintiffs have failed to satisfy their burden of proof in that they have not proven the existence of an oral contract by clear and precise evidence. Plaintiffs allege that Continental committed orally to provide Temp–Way with financing. Plaintiffs, however, fail to provide clear and precise evidence, such as, the amounts to be loaned, and when, terms of repayment, interest rates, or even dates that such commitments to provide financing were given. As such, the evidence is woefully insufficient to support the existence of a binding oral contract. *See Orchard v. Covelli,* 590 F.Supp. at 1556.

### Business Coercion and Economic Duress (Count III)

25. Count III states a claim by Temp–Way for business coercion and economic duress and alleges that Continental took advantage of Temp–Way's weak financial

position and coerced the company to enter into financially disadvantageous agreements. Specifically, Count III alleges that defendant Francis Conway advised Continental that Temp–Way was in dire need of working capital and Continental then used that knowledge to exploit Temp–Way's vulnerable financial position by inducing them to enter a contract they otherwise would not have entered. According to Temp–Way, Vicari, with promises of financing and threats of foreclosure, coerced plaintiffs into executing the stock purchase agreement, pledging the Spellmans' personal assets as collateral, selling the Lindbergh Property premises, the only source of collateral for other financing and increasing the company's volume of contracts.

■ 26. In order to establish business coercion and economic duress, Temp–Way must prove that:

(1) serious economic injury was imminent;

(2) [there existed] such pressure that the party involuntarily executed an agreement leading to economic loss; and

(3) there was no immediate legal remedy available as an alternative to executing the agreement.

*Levin v. Garfinkle,* 492 F.Supp. 781, 807 (E.D.Pa.1980) (citing *National Auto Brokers Corp. v. Aleeda Development Corp.,* 243 Pa.Super. 101, 364 A.2d 470, 476 (1976)), *aff'd* 667 F.2d 381 (3d Cir.1981).

■ 27. Where persons deal with each other on equal terms and at arm's length, there is a presumption that the person alleging duress possesses ordinary firmness. *Levin,* 492 F.Supp. at 807 (citing *Carrier v. William Penn Broadcasting Co.,* 426 Pa. 427, 233 A.2d 519, 521 (1967)). The doctrine of economic duress does not apply merely because one enters into an agreement which he would not otherwise have entered if his financial circumstances

were more secure. *Harrison v. Fred S. James, P.A. Inc.,* 558 F.Supp. 438 (E.D.Pa. 1983). To prevail on a claim for duress, plaintiffs must demonstrate that the pressure exerted by defendants on plaintiffs was so severe as to overcome the mind of a person of ordinary firmness. *Id.* There is insufficient evidence to sustain plaintiffs' burden under these authorities that defendants asserted severe pressure over Temp–Way so as to force the company to enter into agreements they would not have otherwise entered.[10]

28. Plaintiffs voluntarily executed the stock purchase agreement, sold the Lindbergh Property and pledged personal property without pressure from Continental. Furthermore, these business decisions did not lead to economic loss, but, rather, resulted in an improved, albeit short lived, working capital condition.

■ 29. Even if Continental's legal right to foreclose on the Lindbergh Property influenced Temp–Way's decision to sell the Lindbergh Property, such action cannot constitute duress, because enforcement of a contractual right does not constitute duress. *Young v. Pileggi,* 309 Pa.Super. 565, 455 A.2d 1228, 1231 (1983). Likewise, Continental's demand for collateral before disbursing funds is an exercise of its contractual rights and is not tantamount to duress.

30. Undoubtedly, had Temp–Way's financial condition been stable, plaintiffs would have preferred not to execute the stock purchase agreement, sign for additional collateral or even sell the Lindbergh Property. Notwithstanding plaintiffs' preference to do otherwise, given the circumstances, the court concludes that plaintiffs entered into the above agreements voluntarily for reasons that were important and necessary to plaintiffs and not because they were subjected to economic duress by defendants.

---

**10.** In addition, a claim for duress is vitiated where a party has had an opportunity to consult with counsel. *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 911 (3d Cir.1985), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986); *Carrier v. William Penn Broadcasting Co.,* 426

Pa. 427, 233 A.2d 519, 521 (1967). The Spellmans were represented by counsel during the preliminary negotiations held prior to April 1, 1984 and through June 3, 1985, the date of the formal purchase of Temp–Way.

*Fraud (Count IV)*

31. Count IV asserts a claim based on fraud. Temp–Way and the Spellmans contend that Continental made a series of fraudulent misrepresentations designed to convince Temp–Way and the Spellmans that adequate financing would be available if the Spellmans became involved with Temp–Way and continued to secure more and larger projects. Specifically, it is claimed that Continental fraudulently promised Temp–Way that it would provide financing and would grant Temp–Way a $1,000,000 loan if Temp–Way produced a substantial guarantor. Plaintiffs also allege that with promises of financing, Continental fraudulently induced them to join Temp–Way and to sell the Lindbergh Property. Additionally, plaintiffs contend that defendants made false threats in order to induce Temp–Way to sell the Lindbergh Property.

32. Under Pennsylvania law, a cause of action for fraudulent misrepresentation is established upon a showing by clear and convincing evidence of all of the following elements:

1) a misrepresentation of a material fact;

2) a fraudulent utterance thereof by defendant;

3) an intention that another person will thereby be induced to act, or to refrain from acting;

4) justifiable reliance by the recipient; and

5) damage to the recipient [caused by its reliance on this representation.]

*Harrison v. Fred S. James, P.A. Inc.,* 558 F.Supp. at 442–43; *Delahanty v. First Pennsylvania Bank N.A.,* 318 Pa.Super. 90, 464 A.2d 1243, 1251–52 (1983). Plaintiffs must prove the existence of each of the foregoing elements by clear and convincing evidence. *Maley v. John Hancock Mutual Life Ins.,* 609 F.Supp. 621, 625 (E.D.Pa.1985).

33. Plaintiffs are unable to prevail on their fraud claim concerning promised financing because, in all instances, the express terms of the written agreements between Temp–Way and Continental were fulfilled. Moreover, plaintiffs fail to establish that defendant made fraudulent oral promises of additional financing.

34. The veracity or accuracy of plaintiffs' allegations that they were fraudulently induced to join Temp–Way with promises of financing is questionable in view of the fact that from the outset, Continental repeatedly denied plaintiffs' requests for financing. Denis Spellman conceded that Vicari advised him that Continental would neither provide funds to the Spellmans for the purchase of Temp–Way nor provide a credit line to Temp–Way. Instead, Vicari suggested that the Spellmans seek financing through Rabner, the outside independent SBA financing consultant. Additionally, when the SBA option surfaced, Vicari did not promise to make the SBA guaranteed loans, but merely agreed to process the loan applications. Vicari advised Spellman in August and September, 1984, that Continental would not advance any funds while the SBA loan application was pending. There is no evidence of a clear and convincing nature to support plaintiffs' allegations that the defendants fraudulently made oral promises to extend more credit.

35. There is, similarly, no evidence to support plaintiffs' allegation that they were fraudulently induced to sell the Lindbergh Property with promises of additional financing.

36. Further, plaintiffs have failed to demonstrate by clear and convincing evidence that Continental and Leis promised plaintiffs a $1,000,000 loan if Temp–Way produced a substantial guarantor or that plaintiffs justifiably relied on such alleged promise. Leis was a loan work-out officer at Continental and, as such, had no independent lending authority. The court credits the evidence that Leis advised Denis Spellman that he did not have the authority to approve a million dollar loan and that such a request would have to be approved by Leis' superiors on the Loan Committee at Continental. In view of the fact that plaintiffs knew that Leis himself did not have authority to approve a million dollar loan, plaintiffs' allegation that they justifiably relied on any such alleged promise has not been proven.

37. The evidence also does not support the Spellmans' allegation that they either became involved with Temp–Way or expanded their contract base in reliance upon Continental's alleged promise to provide financing if they did so. The Spellmans' decided to join Temp–Way in December, 1983 before firm discussions with Continental regarding financing even began. They signed a letter of intent on January 12, 1984 and gave the Calcaras a nonrefundable $18,000 deposit toward the purchase of the company, notwithstanding professional advice to the contrary. Letter of Intent (Defendants' Exhibit 19). Further, the evidence reveals that it was Denis Spellman and not Continental who originated the idea of increasing the size and volume of Temp–Way's future contracts. In fact, beginning in February, 1984, before the Spellmans officially became Temp–Way's employees on April 1, 1984 and before SBA funding discussions began, Temp–Way, with the aid of the Spellmans, embarked upon a contract expansion program by submitting bids on the three Navy contracts.[11]

*Intentional Interference With Contracts (Count V)*

38. Count V of the amended complaint alleges that the defendants tortiously interfered with Temp–Way's contractual relations by encouraging and inducing Temp–Way to enter into contracts for more and larger projects when the defendants knew that these contracts would not be funded. According to Temp–Way, at times defendants permitted Temp–Way's account to incur overdrafts and at other times defendants selectively dishonored overdrafts. This conduct, Temp–Way alleges, caused it to fall into distrust in the industry.

39. The Pennsylvania Supreme Court has explicitly adopted the standard of the Restatement (Second) of Torts § 766 (1979) for determining the elements for tortious

interference with existing contractual relations. *United States Healthcare Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 925 (3d Cir.1990).[12]

40. In order for Temp–Way to prevail on its claim for intentional interference with contractual relations, Temp–Way must prove that it had a contract or an expectation to contract with a third party, Continental's communications with the third parties were intended to induce or cause the third party to break its contract with Temp–Way and Continental acted improperly. Temp–Way bears the burden of proving all three elements. *Nathanson v. Medical College of Pennsylvania,* 926 F.2d 1368, 1388 (3d Cir.1991).

41. In determining whether or not an actor's conduct is proper, the Restatement (Second) of Torts § 767 (1979) considers the following factors:

a) the nature of the actor's conduct,

b) the actor's motive,

c) the interest of the other with which the actor's conduct interferes,

d) the interest sought to be advanced by the actor,

e) the social interest in protecting the freedom of action of the actor and the other contractual interests of the other,

f) the proximity or remoteness of the actor's conduct to the interference and

g) the relations between the parties.

*Id.*

42. As a threshold matter, Temp–Way failed to establish that Continental induced Temp–Way to increase the number of contracts upon which it bid. The record reveals that Denis Spellman originated the idea that Temp–Way increase the size and volume of the company's contracts. Specifically, Denis Spellman prepared loan proposals in which he took credit for and en-

---

**11.** The Spellmans joined Temp–Way as employees on April 1, 1984. They testified however, that in February and March, 1984, they assisted Mr. Calcara in developing estimates and bids on future contracts.

**12.** The Restatement (Second) provides:
One who intentionally and improperly interferes with the performance of a contract (ex-

cept a contract to marry) between another and a third person by including or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the third person's failure to perform the contract.
Restatement (Second) of Torts § 766 (1979).

thusiastically endorsed the concept of Temp–Way increasing its volume of contracts. For example, in a letter to Vicari dated February 15, 1984 signed by Denis Spellman, Temp–Way set a goal of $3,000,-000 in gross sales, a dramatic increase from the previous year. Similarly, in a May, 1986 loan proposal, Denis Spellman acknowledged that in 1985, "Temp–Way developed its marketing effort to make further penetration into commercial projects," and predicted that "the increase in sales and the improvement of the gross profit percentages will provide the necessary funds to earn the investors a good return." Temp–Way's Loan Proposal dated May, 1986 (Defendants' Exhibit 7).

43. In a letter to Leis dated February 15, 1985, Denis Spellman restated his goal of increasing sales:

> To meet our obligations under the debt agreements, to stay current with present obligations, and to achieve our goals in regards to financial debt payback, we must do $3,000,000.00 in sales in 1985. With almost half that amount already established now, it is not too ambitious to believe that this goal is attainable.

Letter to Continental's Vicari from Denis Spellman (Plaintiffs' Exhibit 67).

44. Moreover, even if Continental induced Temp–Way to increase the number of contracts upon which it bid, Temp–Way's claim for intentional interference with contractual relations has not been proved. There is insufficient evidence to support a finding that Continental, by its refusal to provide financing, intended to interfere with Temp–Way's contractual relations with anyone. Defendants' actions were taken for the purpose of protecting its rights, and, as such, cannot amount to liability for intentional interference with contract. *See Green v. Interstate United Management Services Corp.*, 748 F.2d at 831.

45. The fact that defendants dishonored some checks is consistent with the arrangement Denis Spellman acknowledged existed between Temp–Way and Continental to honor only overdrafted payroll checks. The evidence fails to show that Continen-

tal, through this process, intended to induce or cause third parties to break contracts with Temp–Way. The evidence shows that Continental agreed to honor overdrafts on an "as needed" basis when assured by Temp–Way that a receivable would be coming in to Temp–Way immediately thereafter which would cover the overdraft. (2/26/91 N.T. 47–49 and 3/4/91 N.T. 73–74).

*Negligent Misrepresentation (Count VII)*

46. The second amended complaint adds a claim by Temp–Way and the Spellmans for negligent misrepresentation. Temp–Way and the Spellmans allege that defendants negligently misrepresented to them a willingness to provide financing to the troubled company. It is claimed that Continental would provide adequate financing if the Spellmans became involved with Temp–Way and that Continental urged that Temp–Way could be made financially healthy with the help of the Spellmans' management. Count VII further alleges that Continental's loan work-out department negligently misrepresented to Temp–Way and the Spellmans that adequate financing and a line of credit would be provided if they continued to secure more and larger projects and that a million dollar loan would be provided to Temp–Way if they were able to obtain a substantial guarantor. They also allege that Temp–Way's overdraft problems would be solved if the Spellmans increased Temp–Way's accounts receivable. In effect, the allegations in Count VII mirror the allegations made in Count IV (the fraud count).

47. Count VII also alleges that defendants had a duty to disclose to Temp–Way and the Spellmans all information known by defendants necessary to efficiently operate Temp–Way. To that end, Temp–Way and the Spellmans maintain that defendants failed to advise the plaintiff that the SBA guaranteed loan had been approved and that funding was available. Additionally, plaintiffs contend that defendants failed to inform them that the account had been transferred to Continental's loan work-out department and that overdrafts would not be honored.

48. The Restatement (Second) of Torts § 552 defines negligent misrepresentation as follows:

One who, in the course of his business, ... or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Id.* False information may be communicated either directly or indirectly by nondisclosure of known material facts. *Browne v. Maxfield,* 663 F.Supp. 1193, 1202 (E.D.Pa. 1987) (citing *Delahanty v. First Pennsylvania Bank, N.A.,* 464 A.2d at 1252).

49. To prove fraudulent misrepresentation, plaintiffs must prove a misrepresentation, a fraudulent utterance thereof, an intention by the maker that the recipient will thereby be induced to act, justifiable reliance by the recipient on the misrepresentation and damage to the recipient as the proximate result. *Scaife Co. v. Rockwell–Standard Corp.,* 446 Pa. 280, 285 A.2d 451, 454 (1971), *cert. denied,* 407 U.S. 920, 92 S.Ct. 2459, 32 L.Ed.2d 806 (1972). Negligent misrepresentation and fraudulent misrepresentation have as common elements a misrepresentation, justifiable reliance, causation and pecuniary loss. The distinguishing elements are the state of mind of the actor and the standard of proof that must be met by the plaintiff.

50. The court concluded in its discussion of plaintiffs' fraud claim, *supra* ¶¶ 31–37, that in all instances, the express terms of the written agreements between Temp–Way and Continental were fulfilled. Further, the court concluded that plaintiffs failed to establish that defendants had made oral promises of additional financing. Plaintiffs fail, as a threshold matter, to establish that defendants made any misrepresentations to plaintiffs on which plaintiffs may have justifiably relied. The differences in the elements between the claims of fraudulent misrepresentation (Count IV) and the claim of negligent misrepresentation (Count VII) do not come into play because the common element of misrepresentation is lacking in the proof offered on both Counts IV and VII.

51. Similarly without merit is plaintiffs' allegation that defendants breached a duty owed to Temp–Way and the Spellmans by failing to disclose information necessary to efficiently operate Temp–Way. In the courts' discussion of plaintiffs' breach of fiduciary duty claim, *supra* ¶¶ 9–16, it found that plaintiffs failed to sustain their burden that Continental owed them a fiduciary duty, and accordingly, plaintiffs' allegation of a breach of duty in Count VII fails for the same reasons.[13]

*Determination of Secured Status; Existence of Debt Set–Off (Count VI)*

52. In Count VI, Temp–Way seeks the court's determination, that if Continental is found liable to Temp–Way under Counts I, II, III, IV, V, VII, then Continental should not be considered a creditor of Temp–Way, secured or otherwise, but rather the court should set-off Continental's liability arising from this lawsuit against amounts owed by Temp–Way to Continental. In view of the fact that Temp–Way does not prevail on any of its claims against Continental, Temp–Way's claim for set-off under Count VI must be denied.

**II. Continental's Three Count Counterclaim and Set-off Fraud (Count I of Continental's Counterclaim)**

53. Count I of Continental's counterclaim sets forth a claim for fraud. The claim alleges that Temp–Way and the Spellmans, upon the belief that Continental would not honor overdrafts on Temp–

---

**13.** The court notes that plaintiffs' allegation that defendants failed to advise them of the SBA's loan guarantee approval is factually incorrect. On January 9, 1985, Continental sent Denis Spellman a copy of each of the three SBA Authorizations which set forth the SBA's approval of the loan guarantee.

Way's operating account, intentionally wrote checks for Temp–Way's operating expenses on Temp–Way's payroll account. Continental contends that in so doing, plaintiffs attempted to fraudulently induce Continental to honor overdrafted checks. The record fails to sustain Continental's burden to show by clear and convincing evidence that the Spellmans intentionally wrote checks on the payroll account in an effort to induce Continental to honor those checks.

*Continental's Counterclaim (Count II)*

■■ 54. Count II of Continental's counterclaim seeks recovery from Temp–Way, in an sum of $986,253.10 plus interest, reasonable attorneys' fees, for amounts owing under various loan obligations executed by Temp–Way.[14] On October 14, 1986, Temp–Way executed a Commercial Term Note which obligated Temp–Way to pay to Continental the principal sum of $635,423.98, plus interest. Commercial Term Note (Plaintiffs' Exhibit 230). Temp–Way executed the Commercial Term Note in order to consolidate previously executed demand notes. Under the terms of the Commercial Term Note, upon Temp–Way's default, the entire balance owed by

Temp–Way became immediately due and payable to Continental.

55. As of April 1, 1987, Temp–Way's unpaid obligations to Continental arising from Continental's honoring Temp–Way's overdrafted checks amounted to $169,022.56. This obligation continues to be due and owing to Continental. *See supra* note 14.

56. On March 18, 1987, Continental issued, at Temp–Way's request and application, an Irrevocable Stand–By Letter of Credit in the amount of $8,000. Stand–By Letter of Credit (Plaintiffs' Exhibit 254). Continental complied with all the terms and conditions of the Irrevocable Stand–By Letter of Credit and Temp–Way's obligations under it continue to be due and owing to Continental.

57. Temp–Way's commitment to Continental under the aforementioned obligations continues to be due and owing, and accordingly, the court will enter judgment against Temp–Way for said amounts, including interest, costs and attorney's fees to be determined.

*Continental's Counterclaim (Count III)*

■■ 58. Continental asserts Count III of its counterclaim and set-off against the

---

**14.** As of October 12, 1990, Temp–Way owes Continental (and the Spellmans and their wives as sureties) the sum of $986,253.10, plus interest thereon and reasonable attorneys' fees, which is comprised of the following:

a) $641,597.90—Commercial Term Note dated October 14, 1986, including interest accruing thereon until the date of Temp–Way's filing of the bankruptcy petition. This $641,597.90 total is comprised of the following:

1) $20,000 Non–Discount Note dated February 5, 1986

2) $125,000 Non–Discount Note dated April 15, 1986

3) $250,000 Non–Discount Note dated July 15, 1986

4) $94,140 balance owed on $100,000 line of credit drawn down by Temp–Way from May through September, 1986

5) $133,814.98 balance owed on $195,000 term loan ($61,185.02 from sale of business premises was applied to $195,000 obligation. The total $55,000 from sale of business premises was applied to Continental note Nos. 72, 73, and 74 in the amounts of $23,000, $20,000 and $12,000 respectively.)

6) $18,642.92 combined interest on the above obligations.

b) $8,000—Letter of Credit dated March 18, 1987, beneficiary of which was Sheet Metal Workers' Local No. 19 Benefit Funds, which was honored on April 14, 1987.

c) $169,022.56—Balance of overdrafts which were covered by Continental Bank.

d) $298,441.99—Interest on the debt calculated through October 12, 1990 at 2% above Continental's prime rate, pursuant to the loan agreements. *Interest will continue to accrue on the debt at the rate of $179.26 per diem.*
Less:

e) $21,703.15—Received on September 11, 1987 at settlement of Calcaras' property located at 1110–1112 Sigel Street, Philadelphia, Pennsylvania.
Less:

f) $109,106.20—Received on March 26, 1990, from the proceeds of the sale of the Calcaras' property located at Lagoon Drive, Margate, New Jersey.
Statement of Debt as of October 12, 1990 (Defendants' Exhibit 90A). (*See* 3/6/91 N.T. 31–33).

Spellmans and the Spellman wives.[15] On or about April 15, 1986, the Spellmans and the Spellman wives executed an Unlimited Surety Agreement in favor of Continental. Unlimited Surety Agreement (Plaintiffs' Exhibit 199). Under the terms of the Unlimited Surety Agreement, the Spellmans and the Spellman wives became jointly and/or severally liable for payments due to Continental by Temp–Way, together with costs and expenses of collection including reasonable attorney's fees. The Spellmans and the Spellman wives have defaulted in payment under the terms of the Unlimited Surety Agreements in that the Spellmans and the Spellman wives have failed to pay the obligations due to Continental by Temp–Way. Accordingly, the court will enter judgment on Count III of Continental's counterclaim against the Spellmans and the Spellman wives, jointly and severally, in a sum of $986,253.10, plus interest at the rate of $179.26 per diem from October 12, 1990 and reasonable attorney's fees to be determined.

An appropriate Order will be entered.

### ORDER OF JUDGMENT

AND NOW, TO WIT, this 13th day of March, 1992, upon consideration of the evidence presented at the trial before this court and upon consideration of the parties' trial briefs and proposed findings of fact and conclusions of law, IT IS ORDERED as follows:

1. Judgment is entered on Counts I, II, III, IV, V, VI, and VII of plaintiffs/counterclaim defendants' amended complaint in favor of defendants/counterclaim plaintiffs Continental Bank, Ronald Vicari, Frank Leis and Francis Conway and against plaintiffs/counterclaim defendants Temp–Way Corporation, Denis J. Spellman and Martin F. Spellman, with prejudice;

2. Judgment is entered on Count I of Continental's Counterclaim in favor of plaintiffs/counterclaim defendants Temp–Way Corporation, Denis J. Spellman and Martin F. Spellman and against defendant/counterclaim plaintiff Continental Bank;

3. Judgment is entered on Counts II and III of Continental's Counterclaim in favor of defendant/counterclaim plaintiff Continental Bank and against plaintiffs/counterclaim defendants Temp–Way Corporation, Denis J. Spellman and Martin F. Spellman and counterclaim defendants Mary Ellen Spellman and Leslie F. Spellman, jointly and severally, in the amount of $986,253.10, including principal and interest accruing thereon through October 12, 1990, plus interest accruing thereafter at the rate of $179.26 per diem and attorney's fees; and

4. Counterclaimants Mary Ellen Spellman and Leslie F. Spellman's counterclaim is dismissed, in accordance with their voluntary withdrawal of their claim at trial.

---

The court accepts defendants' per diem interest calculation.

**15.** In Count III, Continental asserts a claim against the Spellmans and pursuant to Rule 13(h) of the Federal Rules of Civil Procedure. Continental joins Mary Ellen Spellman and Leslie F. Spellman as parties to the counterclaim and set-off.